[No. 14579. Department Two. May 6, 1918.]

FRANK W. FLOOD, *Respondent,* v. RALPH EDUARD
VON MARCARD *et al., Appellants.*[1]

CONTRACTS—BY TELEPHONE—EVIDENCE. A contract for an exten-
sion of time to complete a sale is not shown by a telephone conver-
sation in which an offer to extend the time was made, and no re-
sponse whatever was made by the other party.

VENDOR AND PURCHASER—TITLE—MERCHANTABLE TITLE. A good
and marketable title is not shown where a title insurance company,
upon the advice of its general counsel, whose learning and skill is
not questioned, refused to insure the title because of a question of
descent, it being an open question whether the law of Germany or
of this state controlled.

Appeal from a judgment of the superior court for
King county, French, J., entered May 16, 1917, upon
findings in favor of the plaintiff, in an action on con-
tract, tried to the court. Affirmed.

[1]Reported in 172 Pac. 884.

*Charles Bedford* and *C. E. Stevens,* for appellants.
*Eugene R. West,* for respondent.

CHADWICK, J.—Respondent brought this action to recover the sum of $500, earnest money paid upon the purchase price of certain lands. The land was sold under an offer made by respondent as evidenced by a receipt signed by the agent of the appellants. The receipt is in part as follows:

"(1) If the owners of said land accept the offer of $10,000, the balance of the purchase price, $9,500, shall be paid within sixty days after written notice is given said Frank W. Flood and abstract of title delivered to him. Conveyance to be by good and sufficient deed free and clear of incumbrance and the owners to pay the taxes for the year 1915.

"(2) If the owners decline or fail to accept said offer within ninety days from the date hereof, the amount paid, $500 will be returned to the Title Trust Company.

"(3) Should said Frank W. Flood fail to pay the balance of the purchase price, $9,500, within sixty days after being notified in writing of the acceptance of his offer, then the $500 hereby acknowledged shall be considered earnest money and forfeited to the owners.

"G. H. Plummer."

The owners accepted the offer upon the terms mentioned in the receipt, and on the 27th day of March, 1916, tendered an abstract of title. Respondent's attorney noted certain liens and incumbrances, and further questioned the title upon grounds growing out of the descent of the property. Mr. Plummer and his attorneys confessed the liens and incumbrances, and after clearing the record of them, resubmitted the abstract. They refused to correct other objections, taking the position that the abstract showed a good title and that respondent was bound to accept it under his contract. Respondent and his attorney were equally

as insistent that the title was not good and that the abstract failed to show a good or marketable title.

There were some negotiations between the parties and between the attorneys. It seems reasonably clear that, between May 18 and May 22, 1916, there were several conversations and several letters passed between the interested parties, Mr. Plummer saying that, although he and his attorney insisted that the title was good, they would, as an act of courtesy, procure certain quitclaim deeds from the heirs of Kreigk, all of whom lived in Germany, but that all the expenses to be incurred should be borne by respondent, and that it was then understood and agreed that such deeds should be procured and that the time for the payment of the balance of the purchase price should be extended for sixty days. Respondent admits having conversation with Mr. Plummer, but denies that such an agreement was entered into, and asserts that he rescinded the sale at that time and demanded the repayment of his earnest money. On June 8th the parties, after some correspondence, met again. Mr. Plummer insists that it was then understood that the deeds were forthcoming, but on account of the uncertainty and delay in the mails, they had not yet arrived.

Appellant, on the other hand, testified that he again demanded the repayment of his earnest money, but agreed with Mr. Plummer that he would take the title as it stood and pay $2,000 down and $2,000 a year for four years, at seven per cent interest, provided the title was guaranteed by a title insurance company. He says that Mr. Plummer objected to this, assigning as his reasons for so doing that he had already gotten an acceptance of the other offers and that it would cause considerable delay and expense and would require time. Respondent again demanded his money.

The fact remains, however, that the title was submitted to a title insurance company at Seattle. Insurance was refused. One of the attorneys for appellants took the matter up personally with the insurance company. Failing to convince it of its error, the matter was referred to the general counsel for the company, who rendered an opinion that the title was not insurable to the extent, at least, of a one-sixth interest. Respondent saw the attorney for appellants on July 19. Respondent met Mr. Plummer on the same day:

"A. Well, I called first at Mr. Stevens' office and I told him that, having finally received the general counsel of the Washington Title Insurance Company's refusal to insure that title, that I presumed he would be now ready to return my money, and asked him if he hadn't changed his mind and he said, 'Not a bit;' whereupon I said, 'I am going down and see if I can see Mr. Plummer. I will see if he has not changed his towards returning my money;' expected fully that after the Washington Title Insurance Company—after they had acceded to my belief, then that they would certainly return that $500. Couldn't see upon what grounds they could refuse. Q. You went to see Mr. Plummer? What conversation did you have with Mr. Plummer? A. Well, Mr. Plummer, he still refused to return it on the ground that the title was good. Ignored it. . . . Q. When was the next conversation you had with Mr. Stevens or with Mr. Plummer in regard to this matter? A. After July 19th. Well, I had no conversations whatever after that with either of them regarding this land. Q. With either one of them? A. No, sir. . . . A. Well, I would like to tell you one more thing regarding my conversation with Mr. Plummer. I had forgotten it. I don't remember, but Mr. Plummer, he said—I said, 'Mr. Plummer, regarding this matter of this eighty acres, I have considered your contract rescinded ever since I first notified you. That is a dead letter, except for me to bring suit for my money, unless you return it to me.' "

Each party undertook to fortify his position by a writing. On July 20, respondent wrote Mr. Plummer as follows:

"Dear Sir: I agreed to accept the title offered me on west ½ S. E. ¼ sec. 25-24-4 E. provided the Washington Title Insurance Co. would insure the same, and it has been finally and firmly rejected after a thorough examination by the company's expert title lawyers, and finally going to its general counsel, so I went over to see you yesterday, trusting I would be able to end the matter by getting the return of my earnest money. I was unsuccessful in this, and must notify you now that unless this money, with interest from the date of deposit, is sent me at once, I shall have suit instituted.

"Will you kindly let me have a reply by next mail?

"Yours truly,
"Frank W. Flood."

Mr. Plummer replied:

"Dear Sir: I am in receipt of your letter 20th instant. As previously explained to you, I take the position that we have offered you good title to the W½ of SE¼ sec. 25-24-4E, and stand ready to convey the land by good and sufficient deed, free and clear of encumbrance, as provided in the receipt for $500 paid on account of purchase price thereof, dated February 4, 1916.

"To comply with the request of your attorney and upon his assurance to me that you would complete the purchase upon securing a deed from Adolph Eduard von Marcard, I wrote the Deutsche Bank, Berlin, May 31st enclosing for signature of Adolph Eduard von Marcard a form of quitclaim deed to the property, and I expect to receive same in course of time, though as you know, the mails between the United States and Germany are interfered with and delayed.

"I desire to repeat that I do not consider that the quitclaim deed from Mr. von Marcard is necessary to perfect title; I take the position that the title which we have submitted to you is good, and therefore must decline to return the earnest money paid, $500.

"The agreement of February 4, 1916, called for the payment of the balance of purchase price within sixty

days after you were notified in writing of the acceptance of the offer and delivery of abstract of title, which notice of acceptance was given March 20th and abstract was delivered March 27th. Upon your attorney's assurance that you would close the purchase immediately upon the delivery of the quitclaim deed from Mr. von Marcard, I extended the time for payment of the balance of purchase price sixty days, which extended time will expire July 27th, but as I am leaving next Sunday for a trip to Alaska and do not expect to return until August 10th, I will, as suggested in our conversation of 19th instant, grant further extension to August 15th, unless the quitclaim deed is received in the meantime, in which event I will expect you to close the transaction promptly. I am leaving the matter in the hands of Mr. C. E. Stevens during my absence, with authority to complete same.

"Yours truly,<br>"G. H. Plummer."

Respondent's attorney denies that he ever agreed to waive other objections and accept the title if supported by a quitclaim deed from Adolph Eduard von Marcard. Mr. Plummer testified to his understanding as follows:

"A. Mr. West called me on the telephone from his office in Seattle, and stated that in fact the title was not satisfactory to them, to his client, and he demanded a return of the earnest money. I told Mr. West that we did not take his view of the title; that we considered it marketable, but that I would make an effort to secure the three deeds that he claimed were necessary to perfect the title; one from Dr. Fester, another from Adolph von Marcard, and a third from Mr. Schlossmacher. . . . however, if there was any expense attached to it I would expect them to stand that expense. . . . I told Mr. West also that, inasmuch as the option expired about that time—I have forgotten the exact date, probably the 26th or 27th—that we would not take snap judgment on them and declare the money forfeited, but that I would extend the time, and I then extended the time sixty days, extended the option sixty days, thinking that we might be able to get the deeds

within that time. Q. What did he say to that, as to whether it was satisfactory or not? A. Mr. West did not express any disapproval of that. I don't recall that he expressed any disapproval of that course at all, and as a matter of fact, assuming that that course was satisfactory to Mr. Flood and his attorney, two or three days later than that I sent to Germany for the deed.''

But we think this is not sufficiently definite to make a contract, granting, but without deciding, that an attorney would have a right to contract for his client for an extension of time upon an option contract for the purchase of land.

This action was begun in September, 1916. Late in December, 1916, Mr. Plummer received the deeds from Germany and notified respondent that he was ready, able and willing to deliver them to respondent.

Appellants have maintained throughout that (a) the title was good, and (b) that respondent was granted an extension of time, and that the deeds were delivered within a reasonable time.

We hold that the testimony is not sufficient to warrant a holding that there was an extension of time granted to respondent, or if it were to be so held, the extension by agreement expired sixty days after June 8, and any other extension was immaterial and not binding on the respondent. He was not bound to accept an extension, and his letter of July 20 negatives an acceptance of a further grant. So that the question of procuring the deeds from Germany within a reasonable time is not a question which can in any sense be held to control respondent's rights.

On the other proposition we are convinced that the title was not free from reasonable doubt under the rule announced in *Moore v. Elliott,* 76 Wash. 520, 136 Pac. 849. That it was not such a title as a buyer would take when exercising ordinary prudence in the conduct of

his affairs is sufficiently evidenced by the refusal of the title insurance company to guarantee it, and the refusal of its general counsel, whose learning and skill in the law cannot be questioned, to approve the title. Neither of these had any interest in the main transaction, and we can conceive of no higher evidence of a want of marketability of title, as that term has been construed by this court, than these opinions.

Few titles are good to a mathematical certainty, nor does the law demand that they shall be so, but the value of a title on a resale is an element to be considered.

"A purchaser is entitled to a merchantable title, a marketable title—such a one as will bring in the market as high a price with, as without the objection." *Parmly v. Head,* 33 Ill. App. 134.

While the law will not countenance the idle scruples of one interested in withholding the purchase money *(Brown v. Witter,* 10 Ohio 143), it will not compel one who seems to be acting in good faith to accept a title if there be reasonable probability of a lawsuit to convince a purchaser on resale, or to quiet the title. *Moore v. Elliott, supra.*

In the case at bar, the objection seems to have been founded in reason. There was a question of descent to be decided by applying the law of Germany or the law of this state. Which law would govern was an open question, and that the objections of respondent were not made idly for the purpose of withholding the purchase price is sufficiently evidenced by his offer made as late as June 8, 1916, to take the title and pay the full price if a company engaged in the business would guarantee it.

We find no error.

Affirmed.

Ellis, C. J., Holcomb, Parker, and Mount, JJ., concur.