[No. 22529-4-I. Division One. February 12, 1990.]

JONATHAN H. SHINN, ET AL, *Respondents,* v. THRUST IV, INC., *Appellant.*

828

*Ralph U. Klose* and *Woodley & Thurston,* for appellant.

*Charles A. Kimbrough, Philip A. Talmadge, Bernard H. Friedman,* and *Talmadge & Friedman,* for respondents.

Agid, J.*—The trial court entered a judgment against Thrust IV, Inc. (Thrust) for breach of the parties' limited partnership and purchase and sale agreements. Thrust appeals the judgment and damage award in favor of Jonathan and Isabel Shinn, respondents and cross appellants herein. The Shinns cross–appeal the trial court's denial of their claims for attorney's fees and damages for violations of securities laws. We reverse in part, affirm in part, and remand in part.

In 1981, the Shinns purchased two waterfront lots (hereafter lot 1 and lot 2) in the Meydenbauer Point subdivision in Bellevue, Washington. The Shinns intended to build their home on lot 2, but purchased both lots so they could control the design of a common driveway for the lots. The facts relating to these two lots are set forth separately below.

### Facts Relating to Lot 1

In 1982, the Shinns entered into a joint venture with Thrust, a California corporation, to build a home on lot 1 and then sell the home and lot. The joint venture took the form of a partnership, with the Shinns as the limited partners and Thrust as the general partner. The partnership agreement required the Shinns to contribute their equity in lot 1 ($123,040), and Thrust would construct a house on the lot. The agreement limited the Shinns' liability to their equity in the lot and made Thrust solely responsible for the financing, construction, and sale of the house and lot.

---

*Judge Susan R. Agid is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150 and CAR 21(c).

During the construction of the house, several events occurred which raised construction costs considerably. These events included a change in the elevation of the house, a defective foundation, a change in the driveway turnaround area that required construction of a retaining wall, the removal of an unsightly shack on neighboring property and the construction of a cabana to replace the shack, and an upgrade in the quality of materials used in the construction of the house.

When the home was completed, the Shinns held an open house and received a consensus opinion appraisal of $625,000 from the 65 agents attending the open house. Thrust negotiated a sale with a prospective buyer and received an offer of $585,000. According to Thrust, Mr. Shinn subsequently called the real estate broker handling the prospective sale and indicated that he desired a quick sale and would be satisfied with a sale price of $575,000. Thrust alleges that after Mr. Shinn's call to the broker, it was unable to negotiate any further increase in price with the prospective buyer. Thrust accepted the $585,000 offer, but later received an offer from a third party for $635,000. The sale resulted in a $105,518 loss on the project and a complete loss of the Shinns' investment.

## FACTS RELATING TO LOT 2

On June 9, 1983, the Shinns and Thrust entered into an earnest money agreement for the purchase and sale of lot 2 in the Meydenbauer Point subdivision. This subdivision was composed of a replat of what was originally the Shorelands Addition Plat. The earnest money agreement called for the payment of $240,000 by Thrust at closing, including $10,000 earnest money, with a balance of $45,000 payable in the form of a promissory note due 1 year later. December 1, 1983, was set as the closing date.

As of November 10, 1983, Thrust had not been provided a preliminary commitment for title insurance as required by the agreement. Consequently, Thrust ordered its own preliminary title report to determine the status of the

property. The report issued on November 16, 1983, revealed that the property was subject to restrictions contained in the original plat of the Shorelands Addition. The report stated in part:

The tracts or lots in this addition are subject to the following perpetual conditions and covenants:

A. That said premises shall be used for residential purposes only, and no building other than one single private residence with the appurtenant out–buildings shall be erected, placed or permitted on said premises or any part thereof, except Tract Numbers 56 to 64, inclusive, upon which two single private residences may be allowed. Private residence shall be deemed to include a private garage building, servant quarters, or other private appurtenant out–buildings or structures.

. . . .

E. . . . . As to the owner and his successors in interest of any lot or lots in said Addition all and singular, the said conditions and obligations are and shall be, and are hereby made covenants running with the land and a breach of any of the said conditions or obligations may be enjoined, abated or remedied by the appropriate proceedings maintained by any of such owners in said Addition or their successors in interest.

Thrust contacted its attorney shortly after receiving this title report. The attorney advised Thrust that the only way to remove the cloud caused by the restrictions was by obtaining the agreement of all the property owners in the Shorelands Addition or by litigation. Thrust immediately contacted Shinn and advised him of this information.

Subsequently, Thrust asked its attorney for a more detailed analysis of the problem. The attorney advised Thrust by letter dated December 5, 1983:

The parcel you are purchasing, Lot 2, Meydenbauer Point, is not one of the original lots of the Shorelands Addition. The individuals who platted the Meydenbauer Bay Point Plat took 17 lots from the original Shorelands Addition (lots 5–21) and replatted them into 18 new lots, i.e., Meydenbauer Point lots 1 – 18. . . . Unfortunately, the people who platted Meydenbauer Point never obtained a release from the other lot owners in the Shorelands Addition, and, in addition thereto, took 17 lots and turned them into 18 lots. The net effect of the developers' actions was to increase the density and create new configurations without the express approval of the other lot owners in

the Shorelands Addition. This raises the issue as to whether or not construction on one of the new Meydenbauer Point lots violates paragraph 1 of the original Shorelands Addition Plat which restricts construction to a maximum of one residence on each Shorelands Addition lot.

Upon receipt of this letter, Thrust advised Shinn by letter dated December 8, 1983, that the Shorelands Addition restrictions constituted an encumbrance and/or defect which was unacceptable to it. Thrust stated that it was exercising its option to rescind the transaction pursuant to the provisions of the earnest money agreement.

Despite Thrust's refusal to close, the Shinns submitted all documents necessary for closing to the parties' designated escrow agent on December 29, 1983, in order to protect their rights and interests and to encourage Thrust to close. The Shinns refused to return Thrust's earnest money.

On January 24, 1984, the Shinns filed a complaint seeking specific performance of the lot 2 earnest money agreement, damages for breaches of duties under the limited partnership agreement, and damages for misrepresentation as to lot 1. In an amended complaint, they added claims for violation of securities laws, violation of the Consumer Protection Act and breach of warranty.

On March 20, 1984, the Shinns moved for partial summary judgment on their claims relating to lot 2, and Thrust filed a motion for partial summary judgment on the same claims. On May 22, 1984, the trial court granted Thrust's motion for partial summary judgment, ruling that title to lot 2 was unmarketable because of the potential for litigation and the building restrictions imposed by the restrictive covenants. The Shinns appealed, and this court reversed and remanded in an unpublished opinion. The Washington State Supreme Court denied Thrust's petition for review.

On remand, the trial court entered judgment in favor of the Shinns. The court awarded them $70,000 for their claims relating to lot 1 and the limited partnership, and approximately $30,000 for their claims relating to the breach of the purchase and sale agreement for lot 2. The

court dismissed the Shinns' claims based on the Washington securities act and the Consumer Protection Act. Thrust appeals from the judgment, and the Shinns have cross–appealed the dismissal of their securities act claim and the denial of their request for attorney's fees.

### Liability for Breach of Lot 1 Partnership Agreement

Thrust first contends the trial court erred in holding it liable on the Shinns' limited partnership claims. Thrust argues that the business judgment rule applies to the actions of a general partner, and that Thrust's actions as general partner are protected under that rule.

The scope of the "business judgment" rule in Washington is somewhat unclear. It has been said that the rule generally "immunizes management from liability in a corporate transaction . . . where a reasonable basis exists to indicate that the transaction was made in good faith." *Interlake Porsche + Audi, Inc. v. Bucholz,* 45 Wn. App. 502, 509, 728 P.2d 597 (1986), *review denied,* 107 Wn.2d 1022 (1987). It has also been said that the rule protects corporate officers from liability for "honest mistakes," even if the mistake "may be so gross that [it] may demonstrate the unfitness of the directors to manage the corporate affairs." *Schwarzmann v. Association of Apartment Owners,* 33 Wn. App. 397, 402, 655 P.2d 1177 (1982) (quoting *Nursing Home Bldg. Corp. v. DeHart,* 13 Wn. App. 489, 498–99, 535 P.2d 137 (1975)). These and other Washington decisions can be read as requiring only "good faith" efforts by management in order to satisfy the business judgment rule. *See Interlake Porsche + Audi; Nursing Home Bldg. Corp.; Para–Medical Leasing v. Hangen,* 48 Wn. App. 389, 396, 739 P.2d 717, *review denied,* 109 Wn.2d 1003 (1987).

■ However, several other cases indicate that the rule not only requires directors to act with "good faith", but also requires them to act with such care as an ordinarily prudent person in a like position would use under similar circumstances. *Seafirst Corp. v. Jenkins,* 644 F. Supp. 1152,

1159 (W.D. Wash. 1986) (applying and interpreting Washington law); *see Schwarzmann,* at 403 (incompetent conduct is actionable under the rule).

In *Seafirst Corp. v. Jenkins, supra,* the United States District Court for the Western District of Washington analyzed Washington law on the business judgment rule to determine the standard of care applicable to corporate officers and directors. The court examined the same cases cited by the parties in the present case, along with RCW 23A.08-.343 of the business corporation act, and concluded as follows:

> Having carefully examined the cases on which defendants rely, the court must agree with Seafirst that proof of good faith alone is not sufficient to satisfy the business judgment rule. The language in *DeHart* is vague enough to admit of that construction, but lacks precedential value because the court did not squarely address the question. Moreover, as Seafirst points out, the authoritative treatise which the *DeHart* court quotes concerning the business judgment rule also states that "[t]he [business judgment] rule exempting officers of corporations from liability for mere mistakes and errors of judgment does not apply where the loss is the result of failure to exercise proper care, skill and diligence." 3A Fletcher Cyclopedia of the Law of Private Corporations § 1040, at 56 (Perm.Ed. 1986).
>
> The court in *Schwarzmann,* while approving of the reasoning and decision in *DeHart,* also stated that it was not the court's role to second–guess the decisions of directors "absent a showing of fraud, dishonesty *or incompetence.*" (emphasis supplied) 33 Wn.App. at 403. Defendant Jenkins dismisses the emphasized language as "an inadvertent phrase." On the contrary, the court finds that the *Schwarzmann* court was deliberately referring to the standard of care with which directors must comply before the business judgment rule becomes applicable. *See id.* at 403 n. 1, where the court noted that since the ruling in *DeHart,* the business judgment rule had been codified in RCW 23A.08.343.

*Seafirst Corp.,* at 1159. We find this analysis of the relevant case law persuasive.[1] The business judgment rule does not appear to protect a defendant's conduct in Washington if

---

[1]We note that Washington courts and the *Seafirst Corp.* court appear to be mistaken in their assumption that RCW 23A.08.343 is a codification of the business judgment rule. The comments to the revised Model Business Corporation Act (§ 8.30) indicate that the statutory language is not intended to be a codification of

the defendant did not exercise proper care, skill, and diligence. *Schwarzmann; Seafirst Corp.*,[2] *see also* E. Brodsky & M. Adamski, *Corporate Officers and Directors* § 2.07 (1984) (business judgment rule protects directors for errors of judgment only if they acted with due care). 3A W. Fletcher, *Private Corporations* § 1040, at 56 (perm. ed. 1986) (stating that the business judgment rule does not immunize officers from liability when "the loss is the result of failure to exercise proper care, skill and diligence."). The question, then, is whether the business judgment rule applies to the action of the general partner, Thrust, in this case.

We have found no Washington case applying the business judgment rule to the conduct of a general partner. While some courts in other jurisdictions have applied the business judgment rule in the partnership setting, *see, e.g., Wyler v. Feurer,* 85 Cal. App. 3d 392, 149 Cal. Rptr. 626 (1978), others have refused to apply the rule to general partners, particularly when contractual or fiduciary standards of care were clearly breached. *Roper v. Thomas,* 60 N.C. App. 64, 298 S.E.2d 424 (1982); *see generally* 59A Am. Jur. 2d *Partnership* §§ 1335–1338 (1987) (recognizing that courts have variously applied the fiduciary duty standard, the business judgment standard, and contractual obligation standard, depending on the circumstances). In *Roper* the court declined to apply the business judgment rule to the actions of general partners because the general partners'

---

the business judgment rule. *See* American Bar Found., *Model Business Corporation Act Annotated* § 8.30 Official Comment, at 928 (3d ed. 1989).

[2]*Bassan v. Investment Exch. Corp.,* 83 Wn.2d 922, 928, 524 P.2d 233 (1974) does not support Thrust's position on this issue. In that case, the court noted in dicta that the business judgment of a partner in partnership affairs is subject to "the degree of care . . . of reasonableness, or in some jurisdictions, of good faith." *Bassan,* at 928. Besides being dicta, this statement can be interpreted as supporting the proposition that a partner's business judgment must meet the standard of care of a reasonable person in similar circumstances. In any event, *Bassan* does not speak directly to the issue raised here.

obligations and duties were set out in the limited partnership agreement, and the partners clearly breached those duties. 298 S.E.2d at 429. We also decline to apply the business judgment rule in this case for several reasons.

First, even if the rule is applicable to partnerships, it could not apply here because Thrust's conduct violated the due care standard requisite to application of the rule. In every instance where the trial court found that Thrust breached its fiduciary duties or the limited partnership agreement, the court expressly or implicitly found a failure by Thrust to use due or reasonable care. Specifically, the court found, either expressly or implicitly, a failure to use due or reasonable care when it found (1) a failure to advance the project in a "timely and workmanlike manner" despite knowledge of the risk to the project if critical phases were not complete prior to the onset of adverse weather in the fall and winter; (2) a failure "to use reasonable care in the selection and supervision of foundation subcontractors"; (3) a failure to "take reasonable steps to conserve capital or control costs"; (4) a failure to exercise "reasonable care" that would have alerted them to the fact that costs were increasing to the point of diluting the capital account of the limited partner; and (5) negligence in the construction of the foundation and in the construction and maintenance of the access road during the construction of the house.

■ Second, the fiduciary duty owed by all general partners of limited partnerships, *Bassan v. Investment Exch. Corp.*, 83 Wn.2d 922, 925, 524 P.2d 233 (1974), includes a duty to exercise due care in managing the partnership. Washington State Bar Ass'n, *Partnership Law and Practice Handbook* § 17.6.3(a) (1984) (citing *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057 (2d Cir. 1977), *cert. denied sub nom. Finley, Kumble, Wagner, Heine, Underberg & Grutman v. Gross,* 434 U.S. 1035, 54 L. Ed. 2d 782, 98 S. Ct. 769 (1978)).

Third, and perhaps more importantly, the parties' partnership agreement itself requires more than a general "good

faith" fiduciary duty on the part of Thrust. Under the express terms of the agreement, the general partner must act "in the best interest of the Partnership", must use "its best efforts to complete the development . . . in a timely and workmanlike manner," and must construct the home "substantially in accordance with the working drawings and specifications . . .".[3] These specific contractual duties stand apart from any applicable statutory or common law standards or duties, *see Roper,* and all of the breaches of duty found by the trial court were breaches of these contractual duties, as well as breaches of other applicable standards of care or duties.

For the reasons stated, we decline to apply the business judgment rule to the actions of Thrust.

## NEGLIGENT HIRING AND SUPERVISING

Next, Thrust contends the trial court's findings do not support its conclusion that Thrust was negligent in hiring the foundation subcontractor. Thrust argues that liability for negligent hiring cannot attach in the absence of evidence that Thrust knew of the subcontractor's unfitness.

The trial court found that Thrust "failed to use reasonable care in the *selection and supervision* of foundation subcontractors" (italics ours), and concluded that Thrust "was negligent in the construction of the foundation . . .". Thus, as the Shinns point out, the trial court actually found Thrust negligent in both hiring *and* supervising the foundation subcontractors. Presumably, the damages flowing from negligent hiring or negligent supervising are the same in this case since any substandard or negligent work on the part of the subcontractors could have been avoided by either proper supervision or nonnegligent hiring. Therefore, even assuming the trial court erred in finding that Thrust negligently hired the subcontractors, the court's conclusion of law is supported by the finding that Thrust was negligent in supervising the same subcontractors.

---

[3] In referring to the specific duties stated in the agreement, the trial court opined that "[t]he agreement is a unique agreement in that sense . . .."

▉ Thrust does not challenge the court's finding of negligent supervision in its opening brief. Thrust states in its reply brief, however, that the trial court held in its oral opinion that Thrust's superintendent was not negligent. This argument must be rejected because the trial court's oral opinion cannot be used to impeach or contradict an unambiguous written finding. *Interlake Porsche + Audi, Inc. v. Bucholz, supra; In re Marriage of Curran,* 26 Wn. App. 108, 611 P.2d 1350 (1980). The trial court's written finding unambiguously states that Thrust negligently supervised the subcontractors.

### DAMAGES ON PARTNERSHIP CLAIMS

Thrust next argues that the damage award must be vacated because the Shinns failed to segregate the overruns attributable to Thrust's conduct from overruns due to other causes. The Shinns, on the other hand, argue that the duty to segregate damages rests with Thrust.

The cases cited by the parties regarding segregation of damages apply either where multiple defendants or tortfeasors cause all of the plaintiffs' damage, *see, e.g., Scott v. Rainbow Ambulance Serv., Inc.,* 75 Wn.2d 494, 452 P.2d 220 (1969) (unfair to deny innocent person redress where he cannot prove how much damage each tortfeasor caused; therefore, burden is on defendants to segregate damages); *Fugere v. Pierce,* 5 Wn. App. 592, 490 P.2d 132 (1971), or where the damage or injury is caused by several events, only one of which involved the negligence of the defendant. *Hufford v. Cicovich,* 47 Wn.2d 905, 290 P.2d 709 (1955). In the instant case, there is only one defendant, and therefore the first line of cases, cited by the Shinns, is inapposite.

The case cited by Thrust, *Hufford v. Cicovich, supra,* held that the plaintiff in that case had the burden of segregating the portion of damages caused by a ceiling fire (caused by the defendant's negligence), from the portion of damages caused by a range fire (not caused by the defendant's negligence). *Hufford,* at 909–10. In so holding, the court noted that segregation was required to take "the issue

of damages out of the realm of guess, surmise, conjecture, and speculation." *Hufford,* at 910; *see also Scott,* at 498. To the extent that the overruns and other damages in this case could have been caused, in part, by factors other than Thrust's negligence or breaches,[4] Thrust argues that, under *Hufford,* the Shinns had the burden of segregating the amount of the losses attributable to Thrust's conduct. We disagree.

■ The burden of segregating should be on Thrust because Thrust had exclusive control of the project and is in a better position to know what other factors, if any, caused the cost increases. In this respect, the instant case is distinguishable from *Hufford.* It appears that neither party in *Hufford* was in a better position to determine which damages were caused by the ceiling fire, and which were caused by the range fire. By contrast, Thrust had exclusive control over the construction and development in this case, and therefore it was clearly in a better position than the Shinns to know the causes of the cost increases which form the basis of the damages in this case. In fact, the terms of the partnership agreement prohibited the Shinns from taking part in the decisions to be made by the general partner. The instant case is also distinguishable from *Hufford* on the ground that the evidence in *Hufford* clearly showed that some of the damage was not caused by the defendant. No similar evidence appears in the record in this case. While the trial court found that some of the cost overruns were not a basis for damage claims in that they would have occurred in the absence of negligence by Thrust (see footnote 4) the basis for all of the cost overruns was within the exclusive knowledge and control of Thrust. Therefore, we hold that Thrust had the burden of segregating damages.

---

[4]In this regard, Thrust correctly points out that the trial court noted in its oral opinion that the cost overruns were not all due to Thrust's conduct. The court stated that some of the increased costs could have been due to "normal and routine business decisions reasonably consistent [with] the general partner's duties" and to "unforeseeable changes and events. . . ."

Thrust next argues that the evidence presented below does not support the trial court's damage award on the lot 1 partnership claims.

It is well settled that damages need not be proven with mathematical certainty, but must be supported by competent evidence in the record. *Interlake Porsche + Audi, Inc. v. Bucholz, supra* at 510. Evidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture. *Bucholz.* Where damages cannot be ascertained with certainty, the trial court must exercise its sound discretion. *Bucholz.*

Here, the trial court found that the Shinns lost their entire equity in the property ($123,040). The court found that Thrust's breaches caused substantial delay and cost increases "documented in the various cost breakdowns submitted as exhibits", and that the evidence established "with reasonable certainty" a "diminution of the Shinns' capital account in the sum of $70,000." In its oral opinion, the court also found that the breaches resulted in "substantially increased financing costs". The court arrived at the damage award of $70,000 based on cost overruns, "together with amenity upgrades and interest costs and incremental increases in the general partner's fees" attributable to Thrust's breaches. The trial court cited cost overruns in exhibit 87 for (a) plans, specifications, and attorneys, (b) excavation, (c) foundation materials, concrete and driveway, (d) lumber and nails, and (e) siding and stucco, together with amenity upgrades, increased interest costs and incremental increases in the general partner's fees.

█ After reviewing the trial court's oral opinion and the written findings, we find that they are inadequate to allow for effective appellate review of the damages issue. A trial court must enter findings showing the basis and method of its computation of damages. *McWhorther v. Bush,* 7 Wn. App. 831, 833, 502 P.2d 1224 (1972). The findings in this case, both oral and written, fail to attach dollar amounts to the various items or areas of damage identified by the

court. Therefore, we must remand the case for entry of more specific findings on the issue of damages. *See McWhorther,* at 833. In the event the trial court determines, in its discretion, that additional evidence must be taken on this issue, we remind the parties that Thrust has the burden of segregating damages.

### BREACH OF LOT 2 PURCHASE AND SALE AGREEMENT

Finally, Thrust contends the trial court erred in concluding that Thrust breached the parties' purchase and sale agreement for lot 2. Thrust argues that its performance under the agreement was excused because the Shinns failed to deliver marketable title as required by the agreement. The Shinns, on the other hand, contend that the title to lot 2 was marketable, and even if it was not, Thrust waived, either expressly or by conduct, the marketable title requirement.

The parties' purchase and sale agreement provides that "title of seller is to be free of encumbrances or defects except those acceptable to Purchaser . . .". The agreement further provides that "building or use restrictions general to the district . . . shall not be deemed encumbrances or defects." An "Exhibit A" attached to the agreement states in part that:

Reference is hereby made to the Real Estate Purchase and Sale Agreement dated June 9, 1983 wherein THRUST IV, INC., a California corporation, or assigns is Purchaser and JONATHAN H. SHINN and ISABEL L. SHINN, husband and wife, are Sellers.

Purchaser's obligations to purchase the real property described in the Real Estate Purchase and Sale Agreement are *contingent* upon the following:

1. Purchaser's ability to obtain financing on terms, conditions and provisions acceptable to Purchaser on or before September 1, 1983;

2. Purchaser obtaining plans and specifications acceptable to Purchaser and sufficient for issuance of a building permit relating to the construction of a single–family residence on the real property before September 1, 1983.

If Purchaser has not removed and/or waived the contingencies described above by written notice from Purchaser to Seller on or before September 1, 1983, then this Real Estate Purchase

and Sale Agreement shall be null and void, and neither party hereto shall have any further rights, duties and obligations hereunder, and the promissory note for the $10,000.00 earnest money previously delivered by Purchaser to Seller shall be immediately returned to Purchaser.

(Italics ours.)

■ On August 31, 1983, Thrust executed an "Addendum to Purchase/Sales Agreement" which stated that "[p]urchaser has removed all contingencies referenced *in the Purchase and Sales Agreement* and Exhibit A of said Agreement." (Italics ours.) The trial court found that the addendum "waived all defects within the meaning of Exhibit 14 [the purchase and sale agreement]." Curiously, in conclusion of law 10, the trial court crossed out the words "any defects in title" and inserted the words "encumbrances and contingencies" so that the amended conclusion of law states that Thrust "waived encumbrances and contingencies to Lot 2 by executing the Addendum to Purchase/Sales Agreement . . .". This apparent ambiguity in the findings and conclusions can be resolved by resort to the court's oral opinion. *In re Marriage of Curran, supra* at 110. In its oral opinion, the trial court stated:

> I think what happened here, and I find from a preponderance of the evidence, that when the earnest money was entered into, and even at the time the waiver was extended by Mr. Vincent on behalf of Thrust IV, that neither Thrust IV nor Mr. Vincent were aware of the Fernandez litigation, which Mr. Erickson called ultimately to their attention. As of August 31st, Thrust IV had waived all contingencies referred to in the earnest money agreement and Exhibit A to the agreement. *I don't think that we could say that the waiver waived the requirements of title insurance, or a warranty deed and obvious fulfillment requisites of the contract,* such as the need to discharge any underlying obligations, but its waiver is reasonably subject to the construction.
>
> *And I find that the defects stated in the previous title and litigation reports which might otherwise be claimed to be title defects within the meaning of Paragraph 4 of the agreement of June 9th, were waived.*

(Italics ours.) Thus, it appears that the trial court found and concluded that the addendum waived any known

defects in title. Thrust argues that the trial court's construction of the agreement and addendum is unsupportable. We agree.

■ A waiver is an intentional relinquishment of a known right. *In re Bellanich,* 43 Wn. App. 345, 717 P.2d 307 (1986). Thrust clearly could have intended to relinquish or waive its right, under the agreement, to marketable title regardless of whether it knew of existing violations. However, Thrust's addendum "remov[ing] all contingencies referenced in the Purchase and Sales Agreement and Exhibit A of said agreement" does not amount to a waiver of its right to marketable title.

As Thrust points out, the purchase and sale agreement only refers to "contingencies" in two provisions: one provision states that the note is "due upon removal of *contingencies described on Exhibit A*" and the other says "the sale shall be closed . . . on or before 90 days following removal of *contingencies described in Exhibit A.*" (Italics ours.) The contingencies described in exhibit A pertain only to financing terms and acceptable plans and specifications sufficient for issuance of a building permit. The exhibit also states that the purchase and sale agreement is null and void if Thrust "has not *removed* and/or *waived* the contingencies *described above* by written notice . . . on or before September 1, 1983." (Italics ours.) Reading the purchase and sale agreement and exhibit A together, the only reasonable construction of the documents is that the "contingencies" referred to in the addendum removing contingencies are those listed in exhibit A. The contingencies do not include marketable title or other terms and conditions of the purchase and sale agreement. Therefore, the title defect or marketability requirement was not expressly waived by the addendum.

■ The next question is whether Thrust waived the marketability provision by its conduct. A waiver by conduct occurs if the actions of the person against whom waiver is claimed are inconsistent with any intention other than

waiver. *Birkeland v. Corbett,* 51 Wn.2d 554, 320 P.2d 635 (1958).

The Shinns argue that Thrust waived the marketability requirement because prior to execution of the earnest money agreement for lot 2, Thrust (1) developed lot 1 without raising any concerns about title encumbrances, (2) sold lot 1 without disclosing title problems, and (3) listed lot 2 for sale after having knowledge of the claimed violations or defects. Thrust's conduct as to lot 1 does not appear to be consistent only with an intent to waive the marketability requirement for lot 2. There is no evidence that Thrust knew of any title problems when it executed the partnership agreement as to lot 1. If it did have such knowledge, it may have decided that it would take a risk on any title problems as to lot 1, but decided that it would not take those same risks as to lot 2. Likewise, while the listing of lot 2 for sale may be consistent with an intent to waive defects, it is also consistent with an intent to generate interest in the property so that a quick sale could be accomplished as soon as the marketability requirement was satisfied and the sale between the Shinns and Thrust closed. The marketability requirement was not waived by conduct.

The only remaining question is whether the trial court correctly found that the title was in fact marketable or free of defects. As previously noted, the marketability issue centers on the existence of a restrictive covenant that may apply to lot 2, and on a violation of former RCW 58.12 that potentially affects the replat that created lot 2. The law on this issue is discussed in this court's prior opinion in this case. In that unpublished opinion, this court noted that under *Hebb v. Severson,* 32 Wn.2d 159, 201 P.2d 156 (1948), the existence of a building restriction, standing alone, would not constitute an encumbrance or title defect under the parties' agreement because "building or use restrictions general to the district" are not deemed to be defects under paragraph 1 of the agreement. Citing *Hebb* and *Northwest Properties Agency, Inc. v. McGhee,* 1 Wn.

App. 305, 462 P.2d 249 (1969), this court framed the issue as "whether Lot 2 *in its present state* violates [the single family residence per lot] restriction" in the original plat. (Italics ours.) The opinion also identified two subissues which the court remanded to the trial court for resolution: (1) Did the replatting of the Shorelands Addition violate the provisions of the prior plat?; and (2) did the replat conform to the statutory requirements of former RCW 58.12?

On the question of whether the replat violated the original plat, the trial court found that the original Shorelands plat did not expressly prohibit replatting. The court also found, however, that the replat creating 18 lots out of the original 17 lots "is technically and potentially inconsistent with the covenants . . . which allowed only one dwelling per lot. . . ." Despite this finding of a technical violation, the court found that lot 2 is "substantially within what was the former Lot 20" of the original plat, and therefore any technical violation was "de minimis" because a residence could be built on lot 2 without violating the one dwelling per lot restriction of the original plat. The court apparently concluded there would be no *presently existing* violation of the plat restriction under *Hebb* so long as a home was built within the borders of the former lot 20.

Though it is true that the one dwelling per lot restriction cannot be violated until a dwelling is placed on a lot, the restriction here has several effects which distinguish it from the normal "restrictions general to the district" deemed acceptable by the parties in their agreement.

■ ■ First, because of the replat, the restriction of one dwelling per lot may not be just a restriction on the number of dwellings per lot, but rather it potentially becomes a restriction on the buildable area of the replatted lots. This latter restriction was not an intended effect of the one dwelling per lot restriction, and therefore it should not be considered an accepted restriction under the portion of the parties' agreement accepting "restrictions general to the

district. . . ." Second, it is unclear whether the one dwelling per lot restriction legally applies to the replatted lots. This legal uncertainty raises the real prospect of litigation and puts the purchaser in the position of not knowing where a dwelling can be legally built on the lot. Under these circumstances, we hold that the restriction constitutes a presently existing defect in the title to lot 2.

We also reject the argument that the defect created by the plat restriction is de minimis simply because a home can be built on lot 2 without violating the plat restriction. The de minimis doctrine allows a court to "not care for, or take notice of, very small or trifling matters." Black's Law Dictionary 388 (5th ed. 1979). The record shows, and it is undisputed, that the one dwelling per lot plat restriction has resulted in litigation over another lot in the Meydenbauer Point subdivision. That litigation, though ultimately settled out of court, lasted some 4 years and cost the property owner $10,000 to $15,000 in legal fees. Also, the property owner was restricted in his ability to litigate the matter in light of the fact that if he prevailed at trial, the matter could be appealed, thus preventing development of the lot for several years. Thus, there is a very real possibility of litigation regarding the plat restriction, and therefore the defect created by the restriction is much more than a trifling or de minimis matter. As will be seen, the possibility of litigation created by the plat restriction and a violation of former RCW 58.12 renders the title to lot 2 unmarketable.

With respect to the question of whether the replat violated former RCW 58.12, the trial court found that the replat "was not done in accordance with . . . RCW 58.12-.030." That statute requires "notice to be served . . . upon all the owners of property not joining in said petition [to change plat] . . .". The court also found, however, that the City of Bellevue substantially complied with the notice provisions of RCW 58.17.090 (notice of public hearing for preliminary plat approval), and found that all owners or their predecessors received actual or constructive notice of the replat. The court found that any claim by these owners

for violation of the original plat would in all probability be barred by estoppel, waiver, laches, or the statute of limitations. Finally, the court found that even if such an action would not be barred and the replat were declared to be invalid, that event would not restrict the right to construct a home on lot 2 so long as the home were built within the boundaries of the original lot.

Thrust does not challenge most of these findings, but instead contends that the trial court's reasoning is faulty because the replat's violation of former RCW 58.12, together with the potential violations of the original plat restrictions, clearly exposes a purchaser of lot 2 to litigation, and it is irrelevant whether the court in the trial of the damages action believed that such litigation would likely be barred or unsuccessful. We agree.

The Washington Supreme court has defined marketable title

> as one being free of reasonable doubt and such as a reasonably informed and intelligent purchaser, exercising ordinary business prudence, would be willing to accept. *Hebb v. Severson, supra.* Such a title need not be perfect in the sense that it is free from every conceivable technical criticism or suspicion, but only from those possibilities of a defect which would give rise to a reasonable question as to its validity.

*Brown v. Herman,* 75 Wn.2d 816, 823, 454 P.2d 212 (1969). Quoting *Dobbs v. Norcross,* 24 N.J. Eq. 327 (1874), the court in *Hebb v. Severson, supra,* stated that

> "'[e]very purchaser of land has a right to demand a title which shall put him in all reasonable security, and which shall protect him from anxiety, lest annoying, if not successful suits be brought against him, and probably take from him or his representatives, land upon which money was invested. He should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value.'"

*Hebb v. Severson, supra* at 166–67. With respect to legal doubts about title, a title is marketable so long as the doubt is not one which

> will cause the judicial mind to hesitate before deciding it; or, as otherwise characterized, a "real" and not "fanciful" doubt, *or*

*such a doubt or uncertainty about the title as will be sufficient to form the basis of litigation.*
. . . Where there are known facts which cast legal doubt upon a title, so that the person holding it may be exposed to reasonable probability of litigation, the title is not marketable. *Flood v. Von Marcard*, 102 Wash. 140, 172 P. 884 (1918).

(Italics ours.) Washington State Bar Ass'n, *Real Property Deskbook* § 34.11, at 34–12 (2d ed. 1986).

Here, the record demonstrates that real doubts exist regarding the title to lot 2, and that there is a reasonable probability of litigation arising from the plat restriction and the violation of former RCW 58.12.030. Therefore, the Shinns' title was not marketable and the trial court's judgment must be reversed.

## Cross Appeal/Securities Claim

The Shinns contend the trial court erred in dismissing their claim for violation of the securities act, RCW 21.20. They argue that the limited partnership interest they "purchased" from Thrust IV is a security under the act. They also argue that Thrust violated the act because it made untrue statements of material fact regarding Thrust's construction expertise, its "view of negative capital accounts", its "view that risk of loss rested with the Shinns", and its "intention to depart from the budget" for the project.

Thrust argues, and the trial court held, that the elements necessary for a claim under the securities act are not present in this case. We agree.

Limited partnerships generally are encompassed by securities laws. T. Hazen, *Securities Regulation* § 1.5, at 21–22 (1985); 11 H. Sowards, *Business Organizations* § 2.01[11]-(c)(i) (1989); *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59 (2d. Cir. 1983); Washington State Bar Ass'n, *Partnership Law and Practice Handbook* § 27.1, at 27–2, § 27.2.4, at 27–9 (1984). In a bona fide limited partnership, the investor puts his funds or property at risk and depends primarily upon the efforts of the managing partners to realize a profit. T. Hazen, at 22. These characteristics, which are presented in the transaction between the parties in this

case, generally fulfill the traditional definition of a "security".[5] T. Hazen, at 22. Nevertheless, the facts in this case and recent federal decisions indicate that the Shinns' limited partnership interest may not qualify as a "security".

In *Marine Bank v. Weaver,* 455 U.S. 551, 71 L. Ed. 2d 409, 102 S. Ct. 1220 (1982), the Supreme Court held that an agreement between two parties was not a "security" under federal law because there was no prospectus distributed to potential investors, and the unique agreement, "negotiated one–on–one by the parties", was not designed to be traded publicly. 455 U.S. at 560. In so holding, the Court noted that Congress intended the federal securities laws to cover instruments ordinarily and commonly considered to be securities in the commercial world. *Marine Bank,* at 559. Similarly, in *Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.,* 595 F. Supp. 800, 806–07 (E.D. Pa. 1984), the court followed the Supreme Court's analysis in *Marine Bank* and distinguished, under the federal securities act, between limited partnerships sold to numerous investors by a soliciting entity with a public offering, and private, small–scale limited partnerships which are negotiated, rather than sold through public offerings. *See also* 11 H. Sowards, *Business Organizations* § 2.01[11] n.165, at 2–77 (noting that some federal decisions suggest that the absence of promotional characteristics may militate against finding a "security", at least in the context of investment contracts).

These federal decisions indicate that the Shinns' limited partnership agreement would not qualify as a "security" because the partnership agreement was negotiated one–on–one, was not part of a public offering, and was not induced

---

[5]The statutory definition of "security" is very broad, and includes any "investment contract" or "investment of money or other consideration in the risk capital of a venture with expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture . . .". RCW 21.20.005(12). *See generally State v. Philips,* 108 Wn.2d 627, 741 P.2d 24 (1987).

by any promotion or solicitation on the part of Thrust. *See* Washington State Bar Ass'n, *Partnership Law and Practice Handbook* § 27.2.2, at 27–7 (1984). Since The Securities Act of Washington, RCW 21.20, defines "security" in essentially the same language used in the federal act, Washington courts have looked to federal law in determining whether a transaction involves a "security". *State v. Philips,* 108 Wn.2d 627, 630, 741 P.2d 24 (1987); *State v. Williams,* 17 Wn. App. 368, 370–71, 563 P.2d 1270 (1977); *see also* RCW 21.20.900 (policy of The Securities Act of Washington is to make uniform the law and to coordinate its interpretations and administration with related federal regulation). Also, like the federal courts, Washington courts hold that "substance and economic realities are more important than form" in determining whether an instrument is a "security." *Philips,* at 631. Thus, the above–cited federal decisions are persuasive authority supporting Thrust's argument that the Shinns' limited partnership interest is not a "security."

On the other hand, in *Haberman v. WPPSS,* 109 Wn.2d 107, 125–26, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed,* 488 U.S. 805, 102 L. Ed. 2d 15, 109 S. Ct. 35 (1988), the court noted significant differences between the purposes of federal securities laws and Washington state securities laws. Though the court stated that Washington securities laws should be harmonized, when possible, with the parallel federal laws, it noted "that while the purpose of federal securities laws is to maintain the integrity of the secondary securities markets and to enforce disclosure, the WSSA is intended to protect investors." *Haberman,* at 125–26. In an earlier decision, the Washington Supreme Court held that the Washington securities act applies to " 'face–to–face' negotiations outside the security markets between private individuals for the sale of the capital stock of a corporation." *Clausing v. DeHart,* 83 Wn.2d 70, 73, 515 P.2d 982 (1973). While the *Clausing* decision is not directly on point, it lends some support to the Shinns' argument that the act applies to private transactions such as the one at

issue here. Thus, *Haberman* and *Clausing* may indicate that a broader definition of "security" applies under our state securities act, and therefore it is unclear whether the transaction in the present case involved a "security" under Washington law.

While we have serious doubts as to whether a security was sold in this case, we need not decide that question. Even assuming that the limited partnership interest in this case is a "security", the trial court found, and the evidence shows, that Thrust did not violate the act. In order to show a violation of the act in this case, the Shinns had to show that Thrust was a "seller" or "offeror" of the security, *i.e.,* the limited partnership interest, *see* RCW 21.20.430(1), RCW 21.20.010, and that Thrust made an untrue statement of material fact or omitted a material fact in connection with the transaction. RCW 21.20.010; *see Haberman v. WPPSS, supra* at 124–33.

 A party qualifies as a "seller" under the act if his or her acts were a substantial contributive factor in the sales transaction. *Haberman,* at 130. Here, the trial court found that the Shinns needed to resell one of their two lots because a balloon payment was coming due. The Shinns, through their real estate broker, approached Thrust and proceeded to negotiate a joint venture in the form of a limited partnership. While there is no question that Thrust was a substantial contributive factor in the parties' agreement, the parties here did not have a true seller/purchaser relationship, and no "sale" within the meaning of the statutes occurred. The absence of any real promotional conduct on the part of Thrust supports this conclusion.

Moreover, even assuming that the partnership interest was a "security" and that the parties had a seller/purchaser relationship, Thrust did not make any material misrepresentations or omissions. The trial court found and concluded that the partnership agreement was "not deceptive or misleading". In its oral opinion, the court found that there were no material omissions or misstatements of material fact.

An examination of the alleged material omissions or misstatements shows that all but one are clearly not actionable. Thrust's alleged failure to tell the Shinns of its "view of negative capital accounts" and its view of "risk of loss" are not omissions of material fact. Thrust's views of negative capital accounts and risk of loss are irrelevant and immaterial since both parties could read the agreement and had the right to demand insertion of any terms or conditions in the partnership agreement in order to protect their interests. Thrust's alleged "intention to depart from the budget" is simply not supported by the record, and is contrary to the trial court's findings. The trial court found that the budgets were estimates, were not represented as a guaranty of what the actual cost would be, and were not unreasonable. The court also found that Mr. Shinn was not misled by the budget estimates, and that he at one point proposed a cap on costs but the cap was later eliminated from the proposed agreement. Finally, Thrust's alleged representations that the project would be promptly started, tightly managed, and finished on time could not have been assertions of material "fact" when they were made, but rather were promises of future performance. The breach of those promises gives rise to liability under the partnership agreement, as discussed above, not under the securities act.

The only omission or untrue statement alleged in the Shinns' brief that might potentially constitute a violation of the securities act is Thrust's alleged failure to disclose its "lack of construction expertise, particularly with respect to steep slopes and difficult soils, despite representations to the contrary . . .". In its oral opinion, the trial court found that there was no misrepresentation as to Thrust's expertise. Thus, the court apparently found no credible evidence to support this alleged misstatement of fact. Credibility determinations are the province of the trial court and will not be disturbed on appeal. *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973).

The judgment as to lot 1 is remanded for entry of more specific findings on damages. The judgment as to lot 2 is reversed.

With respect to the cross appeal, we affirm the trial court's dismissal of the Shinns' securities act claim. Because we are reversing the judgment as to lot 2, the Shinns are not entitled to attorney's fees on that claim.

SCHOLFIELD and WINSOR, JJ., concur.

Review denied at 114 Wn.2d 1023 (1990).