[No. 33461-1-I.    Division One.    May 6, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM
A. ARGO, *Appellant*.

*Mary Jane Ferguson*; and *Eric J. Nielsen* and *Nielsen & Acosta*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *John E. Bell, Deputy*, for respondent.

*Christine O. Gregoire, Attorney General*, and *Robert J. Fallis, Deputy*, on behalf of the Securities Division of the Department of Financial Institutions, amicus curiae.

KENNEDY, A.C.J. — William A. Argo appeals his conviction of six counts of first degree theft and eleven counts of securities fraud. Argo contends that the trial court erred in concluding that the transactions in which he and his victims engaged involved securities within the meaning of the Securities Act of Washington, RCW 21.20. Argo also contends that the trial court erred in concluding that transactions that occurred more than five years before the filing of the information were not barred by the statute of limitations. Finally, Argo contends that the trial court

erred in calculating his offender score and in imposing an exceptional sentence of ten years. Finding no reversible error, we affirm.

## Facts

Argo was a certified public accountant whose license to practice public accounting was suspended in 1988. After that date, Argo continued working as a tax planner and financial advisor until his arrest in 1993.

Beginning in the 1970's, Argo raised money from investors for various business ventures. Two of these ventures were partnerships, purported or real, in which Argo sold interests or options to purchase interests for varying sums of money. Argo also collected money from investors for the "William Argo Trust." The William Argo Trust was not a formal trust arrangement, but rather a name Argo placed on a collection of bank accounts that he maintained at various banks and into which he deposited investors' moneys. In general, Argo's investors would place money in the William Argo Trust Account with the expectation of receiving a set, guaranteed rate of interest in return. Most often, Argo did not inform the investors specifically how their money would be invested. On several occasions, Argo informed investors that their money would be used to finance loans to others. Some of these investors received promissory notes in exchange for their investments in the William Argo Trust.

In November of 1990, the Securities Division of the Washington Department of Financial Institutions began investigating Argo's investment practices after receiving an inquiry from the adult children of one of Argo's elderly investors. A Securities Division examiner discovered that Argo had recently been the subject of an involuntary bankruptcy petition, and that he owed at least 40 investors, collectively, several million dollars. When the Securities Division subpoenaed Argo to testify and produce his investment records, Argo refused, and was held in

contempt of court. Argo eventually produced his records, but given their state of disarray, the Securities Division decided to track Argo's activities through his bank records, instead. Examination of Argo's bank records led the Securities Division to most of Argo's investors. Interviews with these investors uncovered others. The investigation revealed that Argo had been operating a Ponzi scheme by which he had collected well over a million dollars. Argo's investors recovered little or none of their money.

Argo was eventually charged with six counts of first degree theft in violation of RCW 9A.56.030(1)(a) and 9A.56.020(1)(a) and (b), and 11 counts of securities fraud in violation of RCW 21.20.010 and 21.20.400.[1] At trial, Argo stipulated to facts sufficient to prove beyond a reasonable doubt every element of the charged offenses,[2] but denied that the transactions in which he and the victims engaged involved securities. In addition, Argo disputed that all of the charged offenses occurred within the statute of limitations. Following a bench trial, the trial court found Argo guilty as charged. The court concluded that the transactions at issue involved securities, and that none of the charged offenses was barred by the statute of limitations.

---

[1] A detailed explanation of the factual background of each of the counts at issue on appeal may be found in the appendix to this opinion. For convenience and clarity, a few of the more minor issues raised by Argo are treated in the appendix rather than in the main body of this opinion. The legal rulings contained in the appendix are as binding upon Argo and the State as those contained in the main body of the opinion, but the rulings contained in the appendix, all of which are based on settled law, lack precedential value and should not hereafter be cited as authority.

[2] The stipulations contained an exception for Count XI. The exception is ambiguous and can be interpreted one of two ways. Argo's counsel on appeal appears to interpret the exception as a concession that Count XI involved a security. Counsel states: "The stipulations also note an exception to the securities issue for Count 11." Brief of Appellant at 8 n.3. Counsel then cites portions of the record in which Argo's trial counsel conceded that certain investments involved securities. While Argo's trial counsel did make certain concessions at trial, she presented both testimony and argument with respect to Count XI. In addition, the trial court made both oral and written findings with respect to Count XI. Because the record indicates that Count XI was at issue before the trial court, the exception should properly be interpreted as excluding Count XI from the general stipulation as to the elements of securities fraud. The issue as to whether Count XI involved a security was thus not conceded.

Calculating an offender score of sixteen, the court imposed an exceptional sentence of ten years. This appeal followed.

## Discussion

### I. Investments in the William Argo Trust

■ Argo contends that his conviction of securities fraud must be reversed because the investments in the William Argo Trust at issue in Counts III through VII, IX, and X did not constitute securities within the meaning of the Securities Act of Washington. The term "security" is defined in RCW 21.20.005, which states in pertinent part:

> "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture; . . .

RCW 21.20.005(12). This definition mirrors the definitions in the Federal Securities Act of 1933, 15 U.S.C. § 77b (1988) and the Securities Exchange Act of 1934, 15 U.S.C. § 78c (1988). *Cellular Engineering, Ltd. v. O'Neill*, 118 Wn.2d 16, 24, 820 P.2d 941 (1991) (citing *State v. Philips*, 108 Wn.2d 627, 630, 741 P.2d 24 (1987)). Thus, Washington courts look to federal law to determine the meaning of the term "security" under the Washington Act. *Id.*; *see also* RCW 21.20.900 (the policy of the Securities Act of Washington is to make uniform the law and to coordinate its interpretation and administration with related federal regulation).

■ The United States Supreme Court has stated that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation

to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946). In determining whether an investment constitutes a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S. Ct. 548, 19 L. Ed. 2d 564 (1967). Because the securities acts are remedial in nature and are designed to protect investors from speculative or fraudulent schemes of promoters, both Washington and federal courts apply a broad definition to the term "security." *S.E.C. v. Glenn W. Turner Enters.*, 474 F.2d 476, 480-81 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973); *Cellular Engineering*, 118 Wn.2d at 23; *Philips*, 108 Wn.2d at 631.

The definition of security in RCW 21.20.005(12) includes investment contracts and notes. Here, the trial court found that the investments at issue in Counts III through VII, IX, and X constituted investment contracts and were thus securities under the Securities Act. The State argues that Counts V and VI may be affirmed on the alternative basis that they involved notes within the meaning of the Securities Act. Argo contends that the investments in the William Argo Trust involved neither investment contracts nor notes under the Securities Act, and thus that his conviction for securities fraud must be reversed.

A. Investment Contract as a Security

The United States Supreme Court first defined the term "investment contract" in *S.E.C. v. W.J. Howey Co.*, *supra*. In *Howey*, owners of large tracts of citrus groves offered to sell smaller tracts to investors, together with optional service contracts for harvesting and marketing the fruit. The Court held that the owners' scheme was an investment contract and thus a security under the Securities Act of 1933. 328 U.S. at 299. Noting the absence of a definition in the statute, the Court explained that an investment contract is "a contract, transaction or scheme whereby a

person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party". *Id.* at 298-99.

■■ The Washington Supreme Court has adopted the *Howey* test, setting forth the elements of an investment contract as: (1) an investment of money; (2) a common enterprise; and (3) an expectation of profits deriving primarily from the efforts of the promoter or a third party. *Cellular Engineering*, 118 Wn.2d at 26; *Philips*, 108 Wn.2d at 632; *Sauve v. K.C., Inc.*, 91 Wn.2d 698, 702, 591 P.2d 1207 (1979); *McClellan v. Sundholm*, 89 Wn.2d 527, 531, 574 P.2d 371 (1978). Argo does not appear to challenge the existence of the first and third elements of the *Howey* test in this case, nor does the record indicate a basis for such a challenge. Rather, Argo contends that, here, there was no common enterprise and that the absence of this element defeats the existence of an investment contract.

In Washington, a " 'common enterprise need not be a common fund. The term denotes rather an interdependence of fortunes, a dependence by one party for his profit on the success of some other party in performing his part of the venture.' " *Philips*, 108 Wn.2d at 632 (quoting *McClellan*, 89 Wn.2d at 532); *see also Sauve*, 91 Wn.2d at 702. In *Sauve*, the plaintiff loaned $15,120 to the defendant, a corporation which leased household appliances to consumers. 91 Wn.2d at 699. In exchange for the loan, the plaintiff received security interests in the appliances purchased with her funds. In addition, the defendant promised to make monthly interest payments to the plaintiff at a rate of 12 percent per annum. *Id.* When the defendant defaulted on the loan, the plaintiff brought an action alleging violations of the Securities Act of Washington. Analyzing the plaintiff's investment under the *Howey* test, the court held that the common enterprise element was met because both the plaintiff's and the defendant's fortunes depended on the efforts of the defendant to find lessees for the appliances the plaintiff's funds had purchased. *Id.* at 702. *See also Philips*, 108 Wn.2d at 632-34 (holding that common

enterprise existed when investors' profits were inextricably woven with loan broker's screening services and ability to locate sound business borrowers).

Here, as in *Sauve* and *Philips*, both the victims' and Argo's fortunes depended on Argo's efforts to manage the "trust" and find appropriate borrowers for the victims' funds. Because there was an interdependence of fortunes, we conclude that the common enterprise element of the *Howey* test was met in this case.

Citing *Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360 (S.D.N.Y. 1992), Argo contends that given the fixed interest rate applied to all of the William Argo Trust investments, the victims' fortunes would not rise and fall with Argo's, and thus there was no interdependence of fortunes. Under Washington law, however, a fixed interest rate does not preclude a finding of interdependence of fortunes. In *Sauve*, the plaintiff contracted to receive a fixed interest rate of 12 percent. Quoting the Ninth Circuit, the court held that profits need not vary when an investor's risk of loss depends on the efforts of a third party:

> It is true that unlike the situation in *Howey*, the financial gain for [the plaintiff] did not vary from year to year depending on the skill with which [the defendant] managed her collateral. Rather, only the risk of loss varied with [the defendant's] management skills. But this distinction between [the defendant's] plan and the *Howey* plan is without significance when determining whether the plan is a security. The distinction is precisely that between a common stock and a corporate bond, yet a corporate bond is not for that reason excluded from the definition of a security. Therefore, the fact that [the plaintiff's] "profit" was constant while her risk of loss depended on [the defendant's] management skills does not remove the plan from the definition of a security.

*Sauve*, 91 Wn.2d at 703 (quoting *El Khadem v. Equity Sec. Corp.*, 494 F.2d 1224 (9th Cir.), *cert. denied*, 419 U.S. 900 (1974)). In this case, as in *Sauve* and *El Khadem*, the investors' risk of loss depended on Argo's management of the

"trust." Although their profits did not vary with Argo's, the investors risked the loss of their entire investment in the event that Argo's management skills failed to keep the "trust" profitable. Under these circumstances, we conclude that there was an interdependence of fortunes, and hence a common enterprise.

Argo also seeks to distinguish this case from those in which a common enterprise has been found by arguing that the differences among the individual investments preclude a finding of a common enterprise. Although the investments contained some variations, all of the investors believed that they were investing in the William Argo Trust. All of the investments were a part of Argo's overarching Ponzi scheme. Our Supreme Court has emphasized that in analyzing whether an investment contract exists, the court will focus on the entire investment scheme, as opposed to individual parts of the scheme. *See Cellular Engineering*, 118 Wn.2d at 25. Thus, individual variations in Argo's investment scheme do not preclude a finding that a common enterprise existed.

### B. Note as a Security

With respect to Counts V and VI, the State argues that Argo's conviction may be affirmed on the alternative basis that the transactions encompassed within those counts involved notes within the meaning of the Securities Act of Washington. We agree.

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990), *aff'd*, 507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993), the United States Supreme Court set forth the test to determine whether a note is a security within the meaning of the Securities Act of 1933. The Court held that because a "note" is one of the items listed in the Act's definition of security, there exists a presumption that a note is a security. 494 U.S. at 64-66. That presumption may be rebutted, however, by a showing that the note strongly resembles one of the types of

notes that do not fall within the definition of a security: (1) notes delivered in connection with consumer financing; (2) notes secured by a home mortgage; (3) short term notes secured by a lien on a small business or its assets; (4) notes evidencing a "character" loan to a bank customer; (5) short term notes secured by an assignment of accounts receivable; (6) notes which simply formalize an open account debt incurred in the ordinary course of business; and (7) notes evidencing loans by commercial banks for current operations. The above notes are used in commercial transactions as opposed to investments, and thus do not require the regulatory protections of the securities acts. *Id.* at 65.

If a note is not sufficiently similar to one of the above seven items to rebut the presumption that it is a security, the determination of whether the note should be added to the list of those that do not constitute securities is based on the following four factors: (1) the motivations of the parties; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of a regulatory scheme which reduces the risk of the investment. 494 U.S. at 66-67.

Here, Argo does not attempt to show that the notes issued to the Steeds and the Spencers resemble one of the seven types of notes that fall outside the definition of a security. Argo contends, however, that the presumption that arises under *Reves* absent such a showing may not be applied in a criminal prosecution because it unconstitutionally shifts the burden of proof to the defendant. We need not determine whether the *Reves* presumption properly applies in a criminal prosecution, however, because applying the four alternative factors set forth in *Reves*, we conclude that the notes issued to the Steeds and the Spencers constitute securities.[3] First, the investors were

---

[3]We note that in *State v. Saas*, 58 Wn. App. 305, 309-12, 792 P.2d 554 (1990), *reversed on other grounds*, 118 Wn.2d 37, 820 P.2d 505 (1991), this court applied the *Reves* test in a criminal prosecution, but ultimately concluded that the notes at issue did not resemble securities. Reversing the Court of Appeals on other

motivated by an intent to invest their funds at the high interest rates offered by Argo. Second, although the notes were probably not meant for common trading, they were transferable instruments and could have been traded among investors. Third, the investing public would reasonably expect the notes to be securities because Argo described them as investments that could earn substantial returns. Finally, there is no regulatory scheme other than the Securities Act that reduces the risk of investing in the notes.

Thus, because the notes at issue in Counts V and VI constitute securities under the *Reves* four-factor test, Argo's conviction on those counts may be affirmed on that alternative basis, as well. ·

II. Loans Made in Exchange for Promissory Notes and Options to Purchase Limited Partnership Units

With respect to Count XI, Argo contends that Carl Pozzani's loans, made in exchange for promissory notes and options to purchase limited partnership units, did not constitute securities because the loans were negotiated pursuant to a unique agreement between the parties which was not designed to be publicly traded. The State responds that the options to purchase limited partnership units were securities, and thus the trial court properly concluded that loans made in exchange for these options constituted securities.

Limited partnership interests are generally considered securities. *Shinn v. Thrust IV, Inc.*, 56 Wn. App. 827, 848, 786 P.2d 285, *review denied*, 114 Wn.2d 1023 (1990); *S.E.C. v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). One commentator has explained the application of the securities laws to limited partnerships as follows:

In the case of a limited partnership interest, the Uniform

grounds, the Supreme Court stated that its "opinion in this case does not foreclose an analysis of *Reves*, however, in an appropriate future case." *State v. Saas*, 118 Wn.2d at 39.

Limited Partnership Act requires that the investment be a passive one. Any significant degree of control or management in the enterprise may transform the limited partner into a general partner. Accordingly, any time there is a bona fide limited partnership interest, by definition, the investor puts his or her funds at risk depending primarily upon the efforts of others—*i.e.*, the managing partners. Since virtually all limited partnership interests involve the investment of money or some other property and further are geared to the expectation of a profit (sometimes in the form of a tax shelter), the traditional definition of a security is clearly fulfilled.

1 T. HAZEN, THE LAW OF SECURITIES REGULATION § 1.5, at 39 (2d ed. 1990) (footnotes omitted).

Argo cites *Shinn, supra,* in support of his argument that the loans in the present case should not be considered securities. In *Shinn,* this court considered whether a unique limited partnership agreement qualified as a security under RCW 21.20. The court explained that under federal law, the agreement would not qualify as a security because the agreement was negotiated one-on-one, was not part of a public offering, and was not induced by any solicitation on the part of the seller. 56 Wn. App. at 849-50. The court noted, however, that Washington securities laws differ from federal laws in that Washington laws are designed to protect investors, whereas federal laws seek to maintain the integrity of the secondary securities markets and enforce disclosure requirements. *Id.* at 850. Although the court declined to decide whether the agreement would qualify as a security under RCW 21.20, it expressed serious doubts that it would.

This case is distinguishable from *Shinn.* In *Shinn,* the limited partnership agreement itself was negotiated between the parties. Under these circumstances, investors do not need the protections of the securities laws because they have the ability to dictate the terms of the agreement upon which their investment is based. Here, however, the limited partnership agreement was already in place; Pozzani and Argo simply negotiated the exchange

of money for options to purchase limited partnership units. When a partnership agreement is already in place, an investor does not have the ability to negotiate the terms of the agreement upon which his or her investment is based. It is such an investment that the securities laws are designed to protect.

Although the agreement in the present case was negotiated face to face outside of the securities markets, it is not thereby excluded from the securities acts. The Washington Supreme Court has explicitly held that the Securities Act of Washington applies to face-to-face transactions negotiated outside of the securities markets. *Clausing v. DeHart*, 83 Wn.2d 70, 73, 515 P.2d 982 (1973). *See also Aspelund v. Olerich*, 56 Wn. App. 477, 784 P.2d 179 (1990) (holding that the Securities Act of Washington applied to the sale of a vending machine corporation that involved face-to-face negotiations outside of the securities markets between private individuals).

Because limited partnership interests are generally considered securities, and because Washington courts have applied the Securities Act to face-to-face transactions occurring outside the securities markets, we conclude that the options to purchase limited partnership units in this case constituted securities under RCW 21.20.

III. The Statute of Limitations

Argo next contends that the charges against him for securities fraud should have been limited to transactions that occurred within five years of the filing of the information. The State responds that because it charged Argo with one continuing course of conduct for each victim, the statute of limitations did not begin to run until the crimes were completed. Furthermore, the State argues that the statute of limitations was tolled by Argo's "lulling" activities.

RCW 21.20.400 provides in pertinent part that "[n]o indictment or information may be returned under this

chapter more than five years after the alleged violation." Here, Argo was charged by information on January 6, 1993. Argo contends that the statute of limitations thus bars all transactions that occurred prior to January 6, 1988. Specifically, Argo asserts that his conviction and the trial court's restitution order must be reversed with respect to the following transactions: Count III (Laurie), investments made between 1981 and 1987 totaling $118,000; Count V (Steed), investments made in 1987 totaling $72,000; Count VI (Spencer), investments made in 1985 totaling $150,000; Count VII (Worsham), investments made between 1982 and 1987 totaling $245,000; Count IX (King), investments made between 1977 and 1987 totaling $37,500; and Count X (Ernst), investments made between 1979 and 1987 totaling $50,000.

The trial court included the above transactions in Argo's convictions and in its restitution order because it found that the statute of limitations was tolled by Argo's lulling activities that served to perpetuate his fraud. Although no Washington court has yet applied the lulling doctrine in securities fraud prosecutions, we adopt it here and hold that transactions that occurred more than five years before the filing of the information were not barred by the statute of limitations.

The lulling doctrine was first applied in federal mail fraud prosecutions to toll the statute of limitations in cases in which the defendant's activities "lulled" victims into a state of passive inactivity. *See United States v. Sampson*, 371 U.S. 75, 83 S. Ct. 173, 9 L. Ed. 2d 136 (1962). The Ninth Circuit has applied the lulling doctrine in securities fraud prosecutions under the federal securities acts. *See United States. v. Brown*, 578 F.2d 1280 (9th Cir.), *cert. denied*, 439 U.S. 928 (1978). In *Brown*, the defendant sold forged land contracts to various investors. Following the initial sale, the defendant mailed purported monthly payments to the investors. Rejecting the defendant's argument that the statute of limitations began running on the date of the sale, the court stated:

> The mailings of purported monthly payments to the purchasers of the land contracts, in our view, constitute an integral part of the transaction which the court found to be fraudulent. In analogous prosecutions under the mail fraud statute (18 U.S.C. § 1341) activities tending to lull investors, either to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered, have been held to constitute a part of the execution of the fraudulent scheme and to be integral to the offense rather than incidental to it.

578 F.2d at 1285. Under the lulling doctrine, the statute of limitations begins running when the defendant's lulling activities are completed.

The Securities Division, in its Amicus Brief, urges this court to adopt the lulling doctrine for securities fraud prosecutions because given the nature of fraud cases, they frequently are not detected until they have been underway for some time. In addition, once detected, fraud cases take an extensive amount of time to prepare. We recognize the difficulties presented by fraud cases, but believe that this particular argument would more appropriately be addressed to the Legislature. Nevertheless, we recognize that lulling of investors is such an integral part of a Ponzi scheme as to be inseparable from the overall fraudulent transaction. Accordingly, we adopt the lulling doctrine for the prosecution of Ponzi schemes such as the one perpetrated by Argo.

Here, under the lulling doctrine, the statute of limitations did not begin to run until Argo ceased his fraudulent activities. Throughout the perpetration of his scheme, Argo provided most of his victims with periodic investment reports purporting to show growth in their capital investments. In addition, Argo provided his victims with periodic payments purporting to be interest. These activities, which continued well into the five year statute of limitations period, served to lull the victims, and groom them for future investments in the fraudulent scheme. Therefore, we affirm Argo's convictions and the trial court's restitution order with respect to all of the fraudulent transactions.

IV. Offender Score Calculation

Argo contends that this case must be remanded for resentencing because the trial court erred in assigning an offender score of 16 rather than 13. At trial, Argo was convicted of both theft and securities fraud with respect to three of the victims (Counts II and III, XII and XIII, and XIV and XV). The State and the trial court acknowledged that these counts constituted the same criminal conduct; accordingly the six counts should have been counted as three in calculating Argo's offender score.

Argo cites *State v. Brown*, 60 Wn. App. 60, 802 P.2d 803 (1990), *review denied*, 116 Wn.2d 1025 (1991), for the proposition that his sentence must be vacated because of the trial court's miscalculation. In *Brown*, the court held that remand was necessary because the miscalculation in that case would significantly affect the standard range. *Id.* at 70. Here, Argo concedes that the standard range would remain the same whether his offender score was 16 or 13. Thus, *Brown* does not mandate remand in this case, and the error in the trial court's calculation of Argo's offender score was harmless.

V. Exceptional Sentence

The standard range for securities fraud convictions is 51-68 months. In this case, the trial court imposed the statutory maximum sentence of ten years. Argo contends that the ten year sentence was clearly excessive, and thus that this court should remand for resentencing.

The Sentencing Reform Act of 1981 (SRA) created presumptive sentencing ranges for most felonies based on the seriousness of the crime and the defendant's criminal history. RCW 9.94A.320-.360; *State v. Oxborrow*, 106 Wn.2d 525, 529, 723 P.2d 1123 (1986). A sentencing court may impose an exceptional sentence outside the standard range if it finds "that there are substantial and compelling reasons justifying an exceptional sentence." RCW

9.94A.120(2). RCW 9.94A.390 provides a nonexclusive list of aggravating factors which the court may consider in imposing an exceptional sentence. Upon appeal of an exceptional sentence, a reviewing court must reverse the sentence if it finds;

> (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for the offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.210(4). Argo seeks reversal of his sentence under both prongs of the above test.

First, Argo contends that the reasons supplied by the sentencing court do not justify the imposition of an exceptional sentence. Relying on the aggravating factors set forth in RCW 9.94A.390, the sentencing court imposed the exceptional sentence because it found that: (1) the current offenses were a series of major economic offenses; (2) the offenses involved multiple victims and multiple incidents of theft and deception from each victim; (3) the offenses involved a monetary loss of over $2.5 million, which is substantially greater than typical for the offenses of theft and securities fraud; (4) the offenses involved a high degree of sophistication and planning and they occurred over a lengthy period of time; and (5) Argo used his position of trust as an accountant and a financial advisor to facilitate the commission of the offenses.

Argo challenges only two of the sentencing court's reasons for imposing the exceptional sentence: that the offenses involved multiple victims and that the offenses involved a high degree of sophistication and planning. We have examined the challenges and find them to be without merit. Although the State filed multiple charges, the trial court's reliance on the existence of multiple incidents as an aggravating factor was appropriate because each count encompassed multiple acts as to each victim. Furthermore, the stipulation contained "real facts"

with respect to nineteen additional, uncharged crimes of a similar nature to the charged offenses which the trial court properly considered in sentencing Argo. With respect to the degree of sophistication and planning, although the crime of securities fraud is often a sophisticated one, not all securities frauds involve elaborate Ponzi schemes such as that perpetrated by Argo. We thus conclude that the challenged grounds fully justify the imposition of an exceptional sentence.[4]

Second, Argo contends that the ten year sentence was clearly excessive. Once the sentencing court finds substantial and compelling reasons for imposing an exceptional sentence, the court is permitted to use its discretion in determining the precise length of the sentence, and its decision will not be overturned absent an abuse of discretion. *State v. Ritchie*, 126 Wn.2d 388, 392, 894 P.2d 1308 (1995); *Oxborrow*, 106 Wn.2d at 530; *State v. Stewart*, 72 Wn. App. 885, 900, 866 P.2d 677 (1994), *aff'd*, 125 Wn.2d 893, 890 P.2d 457 (1995); *State v. Ross*, 71 Wn. App. 556, 568, 861 P.2d 473 (1993), 883 P.2d 329, *review denied*, 123 Wn.2d 1019 (1994). A sentence is clearly excessive if it is based on untenable grounds or reasons, if it is manifestly unreasonable, or if no reasonable person would impose it. *Oxborrow*, 106 Wn.2d at 531 (quoting *State v. Strong*, 23 Wn. App. 789, 794, 599 P.2d 20 (1979)); *Stewart*, 72 Wn. App. at 900; *Ross*, 71 Wn. App. at 568-69.

---

[4]We note also that in imposing the exceptional sentence, the court explicitly stated: "The defendant's criminal actions meet every aggravating factor set forth under RCW 9.94A.390(c) that gives this court discretion to depart from the guidelines of the sentencing reform act, *each aggravating factor being sufficient to support the exceptional sentence.*" Clerk's Papers at 160 (emphasis added). Thus, even if we were persuaded by Argo's challenges, three reasons provided by the sentencing court remain unchallenged, each of which the court found was sufficient, standing alone, to support the exceptional sentence. Because Argo has not challenged these reasons, and because there is ample evidence in the record supporting them, we conclude that the reasons supplied by the sentencing court justify the imposition of an exceptional sentence in this case. *See State v. Negrete*, 72 Wn. App. 62, 71, 863 P.2d 137 (1993), *review denied*, 123 Wn.2d 1030 (1994) (holding that although two of the sentencing court's three reasons for imposing an exceptional sentence were invalid, remand for resentencing was not necessary because the court explicitly indicated it would impose the same sentence for any one of the reasons standing alone); *accord State v. Barnes*, 117 Wn.2d 701, 712, 818 P.2d 1088 (1991).

At the sentencing hearing, the court explained the factors it relied upon in imposing the exceptional sentence. The court focused on Argo's lack of remorse, the number and vulnerability of his victims, the duration of his fraudulent scheme, his abuse of trust, the amount of money stolen and the manner in which he stole it. These facts indicate that the sentence was not based on untenable grounds or reasons. Furthermore, the sentence did not exceed the statutory maximum of ten years. Because a reasonable person would impose a ten year sentence based on the facts of this case, we conclude that the sentence was not clearly excessive.

Affirmed.

## APPENDIX

The following counts are at issue on appeal:

Count III — Laurie

Miriam Laurie began investing in the William Argo Trust in 1981. Before she made an investment, Laurie always asked Argo what he could do with the money she was investing. Argo would quote a set interest rate, usually 12 percent. Argo would not, however, specify where the money was going. Laurie made all of her investments by checks payable to the William Argo Trust.

Laurie made her first investment of $50,000 in 1981. In return, she received interest payments written against the "trust" account through late 1990. By the end of 1987, Laurie had made eight more investments in the "trust" totaling $68,000. While she did not receive interest payments on these investments, Laurie did receive handwritten ledger sheets showing purported investment growth. On September 27, 1988, Laurie invested $9,000 on behalf of herself, her daughter, and her grandchildren. She invested another $40,000 on September 6, 1990, after Argo told her, "I have the money already invested for you." Clerk's Papers at 126.

Between 1981 and 1990, Laurie invested a total of $167,000 in the William Argo Trust. The trial court ordered restitution of $167,000.

## Count IV — Turbutt

Teri Turbutt began investing in the William Argo Trust when her mother became seriously ill in 1988. Argo told Turbutt that he brokered short term loans and that he could offer her a good return, prime plus 5 percent, on her investment. According to Argo, Turbutt would invest her money in the William Argo Trust, and Argo would in turn loan her money out to contractors and developers.

On January 8, 1988, Turbutt gave Argo a check payable to the "trust" for $25,000. Argo told Turbutt that she was making a $50,000 investment secured by a note on land. Turbutt never received any documents evidencing a security interest in land. By May 14, 1988, Turbutt delivered two more checks to Argo to complete the $50,000 investment. When Turbutt demanded the return of her investment, Argo gave her a check for $20,000 written on the account of Pat Bedding Haven. Turbutt never received the remainder of her investment.

The trial court ordered restitution of $20,000.

## Count V — Steed

Harold and Delores Steed began investing in the William Argo Trust in 1987. Argo told the Steeds that he could invest their money at attractive rates by using it to make short term loans to people in the business community. As with the others, Argo did not specifically inform the Steeds to whom the money would be lent.

On May 13, 1987, the Steeds gave Argo a check payable to the William Argo Trust for $40,000. Argo returned a few days later with a promissory note purportedly signed by Donald McKay. Between 1988 and 1989, the Steeds received payments on the McKay note totaling approximately $8,000. These payments were drawn on the William Argo Trust account. On June 4, 1987, the Steeds

gave Argo another check payable to the "trust", this time for $12,000. In return, Argo gave them a note signed by Harold Olds. When the Steeds received $15,300 in purported principal and interest on the note, they reinvested the principal by delivering another check for $12,000 to Argo on June 13, 1988. In return, the Steeds received a new note signed by Olds. On July 24, 1987, the Steeds gave Argo a check for $20,000 and received in return a note signed by Robert E. Bachert.

On May 6, 1988, the Steeds gave Argo five checks payable to the William Argo Trust totaling $200,000. Argo told the Steeds he would invest the money at prime plus 4 percent. A few days later, Argo returned with five promissory notes purportedly signed by Olds and Bachert. The Steeds received $7,000 in purported interest payments on the Olds/Bachert notes. These payments came directly from Argo, however, and were drawn on the William Argo Trust account.

Between May of 1987 and May of 1988, the Steeds invested $272,000 in the William Argo Trust. The trial court ordered restitution of $262,000.

### Count VI — Spencer

Jack and Shirley Spencer began investing in the William Argo Trust in 1985 when they sought Argo's advice on investments. Argo informed the Spencers that if they invested in the "trust", they could earn prime plus 2 percent on their investment. As with the others, Argo did not specifically inform the Spencers to whom the money would be lent.

The Spencers invested $20,000 by writing a check payable to the William Argo Trust. In return, they received a promissory note signed by Howard Olds. In August of 1985, the Spencers invested another $130,000 in the William Argo Trust. Argo informed the Spencers that this money would be secured by property near Alderwood Mall. The Spencers received a note and deed of trust from the purported borrower at prime plus 3 percent. On June 10,

1988, the Spencers made a final investment of $55,000. They did not receive a note in return for this investment. Argo promised them prime plus 3 percent. The Spencers received annual updates on their investments from Argo through 1990.

Between 1985 and 1988, the Spencers invested $205,000 in the William Argo Trust. The trial court ordered restitution of $205,000.

## Count VII — Worsham

Between 1982 and April of 1989, Marjorie Worsham made nine investments in the William Argo Trust totaling $285,000. The bulk of these nine investments, $245,000, was made prior to January 6, 1988. The final investment, $50,000, was made on April 15, 1989.[5] Argo induced Worsham to invest in the "trust" by assuring her he could obtain prime plus 2 percent in safe investments. Until the date of her death in 1990, Argo sent Worsham monthly interest payments and provided her with annual updates depicting purported investment growth. As with the others, Worsham made all checks payable to the William Argo Trust. The record does not indicate whether she knew where her money would be invested. The trial court ordered restitution of $250,000.

## Count VIII — Teels

Stephen and Elda Teel purchased from Argo a one-eighth interest in a purported partnership which owned a thirty acre parcel of land near Boeing in Mukilteo. As the State points out, Argo conceded at trial that the partnership interest constituted a security. Because the issue was not argued at trial, we refuse to consider it on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); *Berg v. Ting*, 125 Wn.2d 544, 555-56, 886 P.2d 564 (1995).

Argo contends that if we conclude that he

---

[5]There appears to be a $10,000 discrepancy in the figures provided by the record.

conceded the issue of whether the Teel's partnership interest constituted a security, he was denied effective assistance of counsel at trial. To demonstrate ineffective assistance of counsel, a defendant must show: (1) that defense counsel's representation was deficient, *i.e.*, that it fell below an objective standard of reasonableness based on consideration of all of the circumstances; and (2) that defense counsel's deficient representation prejudiced the defendant, *i.e.*, that there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 334-35 (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (adopting the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *State v. King*, 78 Wn. App. 391, 404, 897 P.2d 380 (1995), *review granted*, 128 Wn.2d 1010 (1996). We engage in a strong presumption that counsel's representation was effective, *McFarland*, 127 Wn.2d at 335, distinguishing between tactical decisions and ineffectiveness. *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995), *cert. denied*, 116 S. Ct. 931 (1996). Where, as here, the claim of ineffective assistance is made on direct appeal, the appellate court will not consider matters outside the record. *McFarland*, 127 Wn.2d at 335 (citing *State v. Crane*, 116 Wn.2d 315, 335, 804 P.2d 10, *cert. denied*, 501 U.S. 1237 (1991); *State v. Blight*, 89 Wn.2d 38, 45-46, 569 P.2d 1129 (1977)).

Argo has not made a sufficient showing from the record to overcome the presumption that his trial counsel was effective. Given the number of counts faced by Argo, counsel's decision to concede that one of those counts involved a security may be characterized as a tactical decision affecting trial strategy. *See State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995) (holding that counsel's decisions involving matters of trial strategy or tactics do not constitute ineffective assistance). Moreover, the record indicates that the purported partnership into which the Teels believed they were investing was never formed. Instead, the property remained only in Argo's name, and

under his sole management and control. Even though Argo lost the property in a 1987 forfeiture, he continued to collect payments from the Teels until 1988, when he told them he had found a buyer for the property. The transaction has characteristics both of an investment contract and a limited partnership in real estate. Thus, for reasons stated in the main body of this opinion, Argo cannot carry the burden of showing in the record that trial counsel's concession was deficient because it is unlikely that Argo would have been successful in contesting the issue at trial. *See King*, 78 Wn. App. at 404.[6]

### Count IX — King

Between 1977 and 1989, Dorene King invested $52,200 in the William Argo Trust. King invested $37,500 prior to January 6, 1988, and $14,700 after that date. As with the others, Argo informed King that she would be investing in the "trust", but he never specified where the money would be invested. King received no notes with her investments, although Argo did make purported quarterly interest payments to her through September of 1990. The trial court ordered restitution of $29,370.

### Count X — Ernst

Between 1979 and 1988, Bydell Ernst invested $51,000 in the William Argo Trust. As with Worsham, the bulk of these investments, $50,000, was made prior to January 6, 1988. The final investment, $1,000, was made on July 8, 1988. Argo told Ernst that he found places to invest money; that he acted like a bank putting borrowers and lenders together. Although Ernst received no notes in return for her investment, Argo made purported quarterly and monthly interest payments to her until December of

---

[6]Argo contends that if this court concludes that the Teels' interest constituted a security, we should nonetheless reduce the restitution order with respect to the Teels from $100,000 to $76,250 to reflect the Teel's actual investment in the partnership. However, because Argo failed to raise this issue below, we cannot reach it on the record presented on appeal. *See State v. McFarland*, 127 Wn.2d at 332-33; *Berg v. Ting*, 125 Wn.2d at 555-56.

1992. All of Ernst's investments were to earn between 12 and 16 percent interest. The trial court ordered restitution of $51,000.

### Count XI — Pozzani

The investments made by Carl Pozzani, a retired businessman, are different from the investments described in Counts III through X, above. Pozzani contacted Argo because he was interested in the product manufactured by Argo's company, Pacific Wood Fibers (PWF). On January 21, 1988, Pozzani loaned Argo $48,000 to cover PWF's operating expenses. In exchange, Argo gave Pozzani a promissory note and an option to purchase 48 limited partnership units of PWF. On February 4, 1988, Pozzani loaned Argo $24,000, once again in return for a promissory note and an option to purchase additional partnership units in PWF.

Having heard testimony and argument on the issue, the trial court concluded that the options to purchase partnership units of PWF were options for the sale of securities, and thus the transactions by which Argo obtained the loans fell within the regulation of the Securities Act.[7] As with Counts III through X above, the trial court found Argo guilty of securities fraud with respect to Count XI.

GROSSE and AGID, JJ., concur.

---

[7]On February 24, 1988, Pozzani made a third loan to Argo for $75,000. In exchange, Argo gave Pozzani a promissory note secured by all of his partnership units in PWF. The trial court held that this transaction was a personal loan to Argo and did not involve a security.