[No. 16161-7-III.   Division Three.   January 27, 1998.]

MARVIN MCLEOD, ET AL., *Appellants*, v. NORTHWEST
ALLOYS, INC., *Respondent*.

*Linnwood D. Sampson* of *Goss, Moe & Sampson*; and *Timothy J. Mackin* of *Taft, Mackin, Grovdahl, Henault & Hancock, P.S.*, for appellants.

*Susan W. Troppmann* of *Etter, McMahon & Lamberson, P.C.*, for respondent.

KURTZ, A.C.J. — By adopting the Uniform Trade Secrets Act (UTSA), RCW 19.108, the Washington Legislature established a three-year statute of limitations for actions alleging the misappropriation of a trade secret. RCW 19.108.060. On January 25, 1990, Marvin and Gertrude McLeod filed this action against Northwest Alloys, Inc., seeking damages for breach of contract and the misappropriation of a trade secret. The parties agree that the confidential information was disclosed by Marvin McLeod, Jr., to a representative of Northwest Alloys on January 14, 1987. The trial court granted summary judgment in favor of Northwest Alloys, and dismissed both claims. The McLeods appeal, challenging the court's conclusion that the misappropriation claim was barred by the statute of limitations. We affirm the judgment of the trial court.

## FACTS

Marvin McLeod, Sr., (hereinafter "Mr. McLeod") began performing research related to the business of Northwest Alloys in 1978. On March 20, 1986, Mr. McLeod and Northwest Alloys entered into a confidential relationship agreement covering proprietary information in Mr. McLeod's possession concerning the recovery of magnesium from sludge. As a result of his work on the magnesium reclamation process, Mr. McLeod discovered another process that lowered the silicon content of the recovered magnesium through the use of ferric chloride. The ferric chloride process is the subject of this lawsuit.

During the period in question, Marvin McLeod, Jr., Mr. McLeod's son, was employed by Northwest Alloys. Marvin McLeod, Jr., made the disclosure to a representative of Northwest Alloys that the use of ferric chloride lowered the silicon content of recovered magnesium. The parties agree that the disclosure was made in January 1987. Marvin McLeod, Jr., testified as follows:

Q. Do you recall approximately when that disclosure was made?

A. Around the middle of January, I believe, of '87.

Q. Okay. Why do you remember that it was the middle of January of 1987, what triggers that date?

A. Because it was extremely cold and it is a hard date to forget after what took place afterwards.

Q. Now, what prompted you to disclose that information?

A. The safety of my fellow workers and to benefit the company.

Marvin McLeod, Jr., also testified that Northwest Alloys began to use the ferric chloride process on the same date as his alleged disclosure. Significantly, Marvin McLeod, Jr., also testified that on that same date in January 1987, he called his father and informed him of the disclosure:

Q. But did [your father] make the decision [to disclose] in January of 1987?

A. No, I did that. I did call him immediately after I had done it and told him the reasons why.

Q. And what was his response?

A. There is nothing you can do about it now, just he would try and get everything straightened out and he would send up those documents with me, showing that he had established or had ordered the ferric chloride and everything.

Within one week of the disclosure, Mr. McLeod's son delivered documents to Northwest Alloys that demonstrated Mr. McLeod's prior use of the ferric chloride process. Mr. McLeod confirmed at his deposition that he had learned of the disclosure from his son on the date the disclosure was made:

Q. Can you recall when Marvin made any communications regarding the ferric chloride to Northwest Alloys representatives?

A. I don't remember the date. I remember them calling me

and telling me he had told him this but I don't remember just the date.

Q. What did he tell you?

A. That he had divulged to them what the ferric chloride that we were using, and that is all, I didn't object pro or con, it has been laid in limbo kind of and all I could say was fine, it was done so —

Q. So at that time was it your belief that the first time Northwest Alloys knew that you had been using ferric chloride to reduce silicon was when Marvin, Jr. told them?

A. As far as I know, that was the only time that it had been divulged to them that I know of.

The McLeods contend that Marvin McLeod, Jr., disclosed the process only after receiving assurances from Northwest Alloys that his father would be compensated. The McLeods assert that February 20, 1987, was the first time that Marvin McLeod, Jr., was made aware that Northwest Alloys did not intend to compensate his father. Mr. McLeod wrote a letter to Northwest Alloys on March 6, 1987, expressing his concern over the company's use of the ferric chloride process and stating his intent to "take whatever legal steps are necessary to protect my legal interest in this matter."

After considering the evidence, the trial court concluded that the disclosure made by Marvin McLeod, Jr., must have occurred on January 14, 1987, the date when Northwest Alloys first used the ferric chloride process. The court concluded that the claim based on the misappropriation of a trade secret was time barred as the complaint was filed on January 25, 1990, more than three years after the McLeods learned of the disclosure to Northwest Alloys and its subsequent use of the process.

## ANALYSIS

Did Northwest Alloys misappropriate the trade secret on January 14, 1987?

■■ The appellate court engages in the same inquiry as the trial court when reviewing an order for summary judgment. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 730, 837 P.2d 1000 (1992). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). All facts and reasonable inferences must be considered in the light most favorable to the non-moving party and summary judgment is appropriate only if, based on the evidence contained in the record, reasonable persons could reach but one conclusion. *Ruff v. King County*, 125 Wn.2d 697, 703-04, 887 P.2d 886 (1995). Where the motion is based on the application of a statute of limitations, the motion should be granted only if the record demonstrates that there is no genuine issue as to the commencement of the statutory period. *Zaleck v. Everett Clinic*, 60 Wn. App. 107, 110, 802 P.2d 826 (1991).

■■ A statutory period of limitation and a cause of action accrue when a party has the right to seek relief in the courts. *Colwell v. Eising*, 118 Wn.2d 861, 868, 827 P.2d 1005 (1992). Statutes of limitation are implemented to address competing interests. The overriding purpose of these statutes is to require parties to exercise their rights within a reasonable time without inflicting an avoidable injustice on the injured party. *First Md. Leasecorp v. Rothstein*, 72 Wn. App. 278, 283, 864 P.2d 17 (1993).

The UTSA establishes a three-year statute of limitations triggered by the application of the discovery rule. RCW 19.108.060 reads as follows:

> An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered . . . [and] a continuing misappropriation constitutes a single claim.

Under the UTSA, a misappropriation is defined as the:

(a) *Acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) *Disclosure* or *use* of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (A) derived from or through a person who had utilized improper means to acquire it, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

RCW 19.108.010(2) (emphasis added). As a result, application of the discovery rule established in RCW 19.108.060 focuses on facts related to the acquisition, disclosure or use of a trade secret.

█ In applying the discovery rule, a cause of action accrues when the claimant knew or should have known the essential elements of the cause of action. *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992). "The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." *Id.* The cause of action accrues when the claimant knows or should know the relevant facts, "whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action." *Id.* An aggrieved party need not know the full amount of damage before a cause of action accrues, only that some actual and appreciable damage occurred. *Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 219, 543 P.2d 338 (1975).

In other words, this court must determine whether there are sufficient undisputed facts to compel the conclusion that the McLeods knew or should have known that a misappropriation of the trade secret occurred on January 14,

1987. The parties agree that on this date: (1) Marvin McLeod, Jr., revealed the confidential information to a representative of Northwest Alloys; (2) Mr. McLeod was informed of his son's disclosure; and (3) Northwest Alloys began testing the ferric chloride process.

The McLeods contend that a careful reading of RCW 19.108.010(2)(b) reveals that the "disclosure" did not take place on January 14, 1987, because Marvin McLeod, Jr., had the express or implied consent of his father to reveal the information. Quoting language from the statute that requires a disclosure "without express or implied consent," the McLeods assert that the son was authorized to make the disclosure based on his close working relationship with his father.

The McLeods also contend that the tests of the ferric chloride process conducted by Northwest Alloys on January 14, 1987, did not constitute "use" of the trade secret as contemplated by the UTSA. The McLeods argue that the term "use" in the statute implies more than a single, isolated act and that the misappropriation by the "use" of a trade secret requires confirmation of the actual or potential economic viability of the trade secret. Under the view adopted by the McLeods, the testing of a trade secret does not constitute the misappropriation of the secret until the tests confirm that the secret has real or potential economic value. The McLeods contend that Northwest Alloys performed this additional testing in February 1987.

The McLeods' contention that Marvin McLeod, Jr., made the disclosure with the express or implied consent of his father is not supported by the record. The only reasonable conclusion that can be made from the son's testimony is that he revealed the information on the spur of the moment and then called his father to inform him of the disclosure. The son stated that his father told him "[t]here is nothing you can do about it now," and that the father "would try and get everything straightened out." These statements demonstrate that the disclosure was not made with the express or implied consent of Mr. McLeod.

Similarly, it is impossible for us to accept the

McLeods' argument that they were not aware of the significance of this disclosure on January 14, 1987. Under the terms of RCW 19.108.010(2)(b), the information was misappropriated when Marvin McLeod, Jr., disclosed the information to a representative of Northwest Alloys without the consent of his father. This unauthorized disclosure was an event of significance and, in the absence of other facts, was sufficient to trigger the commencement of the statutory limitations. Furthermore, the UTSA expressly provides that a continuing misappropriation constitutes a single claim. Once the date of the unauthorized disclosure is established, the McLeods cannot argue that a new period was triggered when Northwest Alloys actually implemented or "used" the trade secret in its operation. RCW 19.108.060.

Both parties base their argument on the UTSA interpretation of the definition of the term "misappropriation." Relying on *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427 (7th Cir. 1994), the McLeods contend that the misappropriation of a trade secret occurs when the trade secret is put to use rather than when it is disclosed. Relying on *Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990), Northwest Alloys contends that the statute of limitations is triggered by the initial disclosure of the trade secret.

We reject the notion that the resolution of UTSA cases turns on a mechanical determination of either the date of disclosure or use. The UTSA provides that the three-year statute of limitations will be triggered by the application of the discovery rule and that an objective standard will be applied to determine whether the misappropriation should have been discovered. RCW 19.108.060. Moreover, under the terms of RCW 19.108.010(2)(b), no preference is given to either the concept of disclosure or use. Accordingly, we conclude that the analysis of statute of limitation questions under the UTSA must be performed with reference to the statutory definition of the term "misappropriation," but with a primary focus on the application of the discovery rule established in RCW 19.108.060.

■ Having reached this conclusion, we acknowledge that the application of a traditional discovery rule analysis may have the practical result of granting special significance to the date of disclosure because this event occurs first in time. Generally, the date of an unauthorized disclosure will serve as the event that triggers the statute of limitations where the date of disclosure can be readily determined and it is shown that the claimant was aware of the disclosure. In other words, the date of an unauthorized disclosure will be the triggering event if the claimant knew or should have known of the disclosure. The date of disclosure is also crucial for another practical consideration. The unauthorized disclosure of a trade secret will always be an event of significance for the simple reason that it is the confidential nature of the information that the claimant seeks to protect.

This does not mean that the inquiry is limited to the date of disclosure. Application of the discovery rule requires a careful consideration of the facts in each case. When the date of an unauthorized disclosure is not immediately discovered by the claimant, the period of limitation will not commence until the claimant knew or should have known of the disclosure. When the disclosure is authorized or the date of disclosure is unknown, facts related to the use of the trade secret and the claimant's knowledge of this use will be determinative. This was demonstrated in the *Sokol* case, which is mistakenly relied upon by the McLeods to support their contention that the date of use is determinative in all instances. Similarly, application of the discovery rule might require an examination of the economic viability of the trade secret to determine "use." Estoppel permits the statute to be tolled in cases when the claimant is prevented or delayed from bringing suit even where the date of disclosure or use has been ascertained.

Here the undisputed facts establish that the disclosure was made on January 14, 1987, and that Mr. McLeod was informed of the disclosure on the same day. Given the most reasonable interpretation, the facts establish that Mr.

McLeod knew or should have known that he had a cause of action against Northwest Alloys for the misappropriation of a trade secret on January 14, 1987, and failed to commence this action within the three-year statute of limitations.

Should the statute of limitations be tolled based on representations made to Marvin McLeod, Jr., concerning payment for the disclosure of the trade secret?

The McLeods contend that representations made by a representative of Northwest Alloys stating that Mr. McLeod would be compensated for the ferric chloride process gives rise to a question of equitable estoppel and the application of the lulling doctrine expressed by the court in *State v. Argo*, 81 Wn. App. 552, 915 P.2d 1103 (1996). The McLeods argue that the misappropriation occurred by way of acquisition and that the acquisition was by improper means because the disclosure was made only in return for the assurance of payment and payment was never made. Under their view, the statute of limitations did not begin to run until the McLeods discovered that the compensation would not be paid.

■■ Estoppel will preclude a defendant from asserting the statute of limitations when the defendant's actions have fraudulently or inequitably induced a plaintiff to delay commencing suit until the applicable period of limitation has expired. *Del Guzzi Constr. Co. v. Global N.W. Ltd.*, 105 Wn.2d 878, 885, 719 P.2d 120 (1986). A defendant is not equitably estopped from raising a statute of limitations when the plaintiff had actual notice of the facts giving rise to a claim in sufficient time for the plaintiff to commence an action before the expiration of the statutory period. *Helgeson v. City of Marysville*, 75 Wn. App. 174, 186, 881 P.2d 1042 (1994).

The McLeods argue that the statute of limitations period should be tolled because of misrepresentations made by Northwest Alloys' representative that Mr. McLeod would be paid for the ferric chloride process if it worked. Nothing in the record indicates that fraudulent conduct by North-

west Alloys caused the McLeods to delay commencing their suit for any appreciable period of time. Under the discovery rule set forth in the UTSA, the McLeods were required to use reasonable diligence in discovering whether or not there was a basis for a cause of action. The events on January 14, 1987, should have been sufficient to put the McLeods on notice that they had to act to protect their claim.

The McLeods rely on *Argo* to support their argument that the court should apply the lulling doctrine to the facts here. *Argo* is not helpful. In *Argo*, the court applied the lulling doctrine to prosecutions of Ponzi schemes where periodic payments and reports lulled the victims into a state of passive inactivity. *Argo*, 81 Wn. App. at 567-68. The McLeods do not allege fraud and do not complain of acts of this magnitude by Northwest Alloys. In fact, the McLeods do not contend that any specific agreement was made with regard to payment for the confidential information or that any payments were received.

## HOLDING

The judgment of the trial court is affirmed.

SWEENEY and KATO, JJ., concur.

Review denied at 136 Wn.2d 1010 (1998).