IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40159-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DALTON SCOTT POTTER, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — A jury found Dalton Potter guilty of one count of first degree (premeditated) murder, two counts of first degree assault, two counts of intimidating a witness, and one count of first degree unlawful possession of a firearm.

Potter appeals, alleging: (1) insufficient evidence was presented to support the convictions for intimidating a witness, (2) insufficient evidence was presented to support the premeditation element of the first degree murder conviction, and (3) the trial court abused its discretion when it found Potter was competent to stand trial. Potter does not challenge the sufficiency of the evidence to convict him of assault and unlawful possession of a firearm.

We agree that insufficient evidence was presented at trial to support the two convictions for intimidating a witness, but disagree that any other error occurred. Although the convictions for intimidating a witness must be vacated for insufficient evidence, resentencing is not required for the reasons discussed below.

We remand for the trial court to vacate with prejudice the two convictions for intimidating a witness, but otherwise affirm.

## FACTS

*Background*

On a winter evening, Darren Estes and his minor daughter, S.E.,[1] were travelling up Badger Mountain Road in Douglas County. S.E. was driving, working to satisfy a requirement for her supervised driver's education hours. They came upon a lime green Kia stopped in the middle of the road with its flashers activated. S.E. passed the Kia and continued on. S.E. was driving slower than the posted speed limit due to the winter conditions. The same Kia they had gone by earlier then drove up behind S.E. and passed. S.E. continued driving until she again encountered the Kia. It was now rolling slowly and

---

[1] To protect the privacy interests of the daughter, who was a minor at the time of the events in this case, we refer to her by her initials. *See* Gen. Order 2012-1 of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts /?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

then came to an abrupt stop. At this point, Estes instructed his daughter to drive any

further, stating, "something's going on," with S.E. stopping their vehicle approximately

100 to 150 feet behind the Kia. 2 Rep. of Proc. (RP) (Oct. 24, 2023) at 661-63.

As they watched, the driver's side door of the Kia slowly opened and what looked

like a purse fell out. Estes then observed a woman, later identified as Alyssa Longwell,

pushing herself out of the Kia:

> Q. And what—what—what—what is the motion that's she's making that leads you to believe she's pushing herself away? Well—what is she doing with her arms and legs?
> A. Well, normally when people, I'm guessing, get out of the car, they open the door, they turn and step out. But the door just kind of came ajar and she pushed backwards out onto her hip, onto the road.
> Q. And—okay. So, she pushes backwards, lands on her hip on the road. And what other motion does she make as she's doing that?
> A. Moving away from the car on her back.

2 RP (Oct. 24, 2023) at 664. Similarly, S.E. testified Longwell "fell out sideways" from

the car and "roll[ed] onto her back." 2 RP (Oct. 24, 2023) at 718.

Estes and S.E. both testified that with Longwell still on the ground, a man, later

identified as Dalton Potter, also exited the Kia. Estes described that Potter "popped out

of the same door" that Longwell exited by appearing to "crawl[] over the seat with the

steering wheel and got a leg out and stood up immediately." 2 RP (Oct. 24, 2023) at 665.

S.E. testified that Potter came out of the same door the woman fell out of, and he "just

kind of stepped out, feet first," and then straddle[d Longwell's body while positioned] . . .

3

toward[] her feet." 2 RP (Oct. 24, 2023) at 719.

At this point, Estes and S.E. observed Potter raising a gun and firing multiple shots at Longwell. Estes described the shooting as: "Execution, maybe two and a half feet? Three feet?" 2 RP (Oct. 24, 2023) at 695.

As soon as Estes noticed Potter firing the gun, he "knew that [he and his daughter] were in trouble" and he told his daughter "get down and get the car into reverse." 2 RP (Oct. 24, 2023) at 667. Estes then heard another gunshot with a bullet going through the front and rear windows of their vehicle, with glass going everywhere, and the bullet eventually hitting the tailgate. Another shot was fired that ricochetted off the hood of their vehicle before hitting the windshield in front of the driver's seat. S.E. was able to shift into reverse and then back up some distance before turning the vehicle to head back down the mountain.

As S.E. got the vehicle moving backward, Estes saw Potter get into the Kia and drive off in the opposite direction, leaving Longwell's body in the road. Concerned for their safety and wanting to relay as much information as soon as possible while it was fresh in his memory, Estes called 911 as they began driving down the mountain. Estes also wanted to seek medical care for S.E., who was concerned about glass in her eyes, and glass imbedded in her hand and eyebrow. Estes and S.E. had travelled only about four miles back down the mountain when they encountered the first law enforcement

4

vehicle responding to the call. At that point, Estes had S.E. pull over and he took over

driving. Estes drove them directly to a hospital emergency room. Additional law

enforcement were already at the hospital by the time Estes and S.E. arrived.

Law enforcement eventually apprehended Potter, who was found at a stranger's

residence near the scene of the shooting. Longwell was declared dead at the scene.

*Pretrial and trial proceedings*

Prior to trial, defense counsel requested a mental health competency evaluation of

Potter pursuant to RCW 10.77.060. Counsel submitted a declaration in support of the

motion, attesting that Potter "presents an inability to participate in conversations with me

in any meaningful way, making it difficult, if not impossible for me to assist him in any

meaningful way." Clerk's Papers (CP) at 52.

The State opposed the motion for a mental health evaluation, noting that "the

record before the Court weighs considerably against doubting [Potter]'s competence."

CP at 63. According to the State, Potter at his two previous appearances in court

presented as "calm and compliant, with no outbursts, tirades, or incoherent statements."

CP at 63. Further, at his preliminary appearance, Potter "asked if he was required to

answer questions" with the State pointing out that this was "an intelligent inquiry [by

Potter] regarding his legal rights, demonstrating an awareness of his surroundings and the

nature of the proceedings against him, and exhibiting a participation in his own defense

5

by invoking his [Fifth] Amendment [to the United States Constitution] right to remain silent." CP at 63.

On February 14, 2023, the trial court granted the defense motion, ordered a mental health competency evaluation for Potter, and appointed a licensed psychologist/forensic evaluator with the Department of Social and Health Services (DSHS) to conduct the evaluation. On February 22, the psychologist, in the presence of Potter's assigned counsel, attempted to interview Potter from the doorway of Potter's jail cell. Potter's counsel and the psychologist both explained their role and the purpose of the meeting, but Potter did not directly respond. He instead looked at the wall near the cell door and stated several times that he wished to speak to "'an attorney or lawyer.'" CP at 96-97. After about five minutes of attempting to engage with Potter, the interview was terminated.

A competency evaluation report was completed on March 6 and filed with the court the following day. The psychologist states in their report that an interview was conducted with Potter's father, and a document review included discovery materials, mental health notes from jail personnel, and healthcare records, and they also reviewed audio recordings from trial court hearings. It was the psychologist's opinion that Potter was not challenged in communicating clearly and effectively, with it noted that Potter did communicate easily and effectively with jail staff, medical professionals, his father, and, when in the court, consistently addressed the judge as "Your Honor." CP at 91-95.

The conclusion reached by the psychologist was that Potter did not display active symptoms of a mental illness, and that Potter possessed the capacity to understand the nature of the proceedings and assist in his own defense.

During a subsequent hearing, defense counsel did not object to Potter being found competent, but did voice apprehension about how evaluation was performed. Specifically, defense counsel was concerned about the duration and quality of the attempted interview of Potter, and various issues with the quality of the information relied on to complete the report. Defense counsel commented that he originally intended to object to the competency finding and retain an expert to evaluate Potter, but decided not to do this because "competency is a very low bar and [the psychologist did] make some explanations in [the evaluation], and I'm not a doctor." 1 RP (Feb. 14, 2023) at 71.

The trial court determined Potter was competent to proceed. In its oral ruling, the trial court provided the following reasoning:

> [T]he Court did review [the licensed psychologist/forensic evaluator's] report and I appreciate [defense counsel] noting for the record . . . some of your concerns. However, the Court also noted the following, and most importantly the conclusion is that [the psychologist/evaluator] opines that Mr. Potter does not suffer from any psychotic disorder. There's no evidence of delusional ideation, no mental disease or defect. There's no evidence of self-harm of suicidal ideation or imminent risk to self or to others, and there's no evidence that his refusal to participate in the proceedings are a result of a mental disease or defect, and he has the capacity to . . . assist his defense counsel, if he so chooses, and understands the nature of the proceedings against him. And the Court is also mindful of what's called

7

the Dusky, D-u-s-k-y standard that is referenced therein, and the case law that surrounds that.

So, based upon the Court's review of the report and the data that was obtained from various sources, the Cour[t] will enter an order finding Dalton Scott Potter competent, and sign the order as proposed.

1 RP (Mar. 7, 2023) at 75-76.

It was discussed during this hearing, with Potter present, that notwithstanding entry of the current competency order the defense retained the right to request a second evaluation by someone outside of the DSHS framework, at any time, including during trial. There is no indication in the record on review that a second evaluation was requested from the court by the defense, or anyone else, at any time thereafter.

While not directly related to the competency issue, shortly after the competency order was entered an investigation did occur into various concerns raised by Potter related to his incarceration. The individual assigned to the incarceration issue began that investigation with the attempt to speak with Potter, who was noted to be "apprehensive about speaking" with the investigator. CP at 672. Potter "declined wanting to be interviewed but then began to speak freely" with the investigator noting, "Potter's demeanor was courteous, respectful, non-combative and matter of fact. He was speaking in complete sentences, and emoted when he spoke, and appeared passionate about his plight." CP at 672.

After a jury trial, Potter was found guilty of one count of premeditated first degree

8

murder, two counts of first degree assault, two counts of intimidating a witness, and one count of first degree unlawful possession of a firearm.[2]

Posttrial, defense counsel appended to their sentencing memorandum a letter to the court, dated December 1, 2023, from a licensed psychologist who had been retained by the defense in June 2023 to evaluate Potter's mental status. Defense counsel took the position that Potter's diminished capacity was a mitigating circumstance that permitted the court to impose an exceptional sentence downward. *See* RCW 9.94A.535(1)(e). The psychologist noted in their letter that they were hired "to evaluate [the mental status of] Mr. Potter pursuant to RCW 10.77," and indicated that they had:

> "reviewed discovery materials for the case, and interviewed Mr. Potter on two occasions within the Chelan County Regional Justice Center. Prior to these interviews, I received and reviewed historical medical and mental health records provided to me by [defense counsel]. These records shed light on Mr. Potter's history of diagnosed mental illness and subsequent treatment which preceded his current legal involvement. Ultimately, a report was not authored in this matter due to Mr. Potter's reluctance to provide the necessary and relevant information to form an opinion with clinical certainty."

CP at 642.

The trial court sentenced Potter to 637 months in prison. He timely appeals.

---

[2] The two assault convictions and two intimidating a witness convictions arose from the same set of facts: Potter firing shots at Estes and S.E.

ANALYSIS

*Sufficiency of the evidence: intimidating a witness*

Potter argues that the evidence presented at trial was insufficient to support the two convictions for intimidating a witness. The State concedes on this issue and agrees with Potter that these convictions should be dismissed.

The due process clause of the Fourteenth Amendment to the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [they are] charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "A defendant's challenge to the sufficiency of the evidence requires the reviewing court to view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007) (citing *State v. Hosier*, 157 Wn.2d 1, 8, ¶ 9, 133 P.3d 936 (2006); *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id*.

The jury was instructed that:

> To convict the defendant of the crime of intimidating a witness, . . .
> each of the following elements of the crime must be proved beyond a
> reasonable doubt:

(1) That on or about January 21, 2023, the defendant by use of a threat against a current or prospective witness, . . . attempted to influence the testimony of that person or induce that person to absent [themselves] from an official proceeding; or induce that person not to report the information relevant to a criminal investigation; and
(2) That this act occurred in the State of Washington.
　　　If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
　　　On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 539, 542. This instruction is in accord with RCW 9A.72.110(1)(a)-(d).[3]

RCW 9A.72.110 criminalizes "threats made to induce a person not to report a crime and, necessarily, threats made before an investigation is commenced." *State v. James*, 88 Wn. App. 812, 817, 946 P.2d 1205 (1997). It is not necessary to intend that the threat be actually communicated to the victim. *See State v. Hansen*, 122 Wn.2d 712, 719, 862 P.2d 117 (1993); *State v. Ozuna*, 184 Wn.2d 238, 247, 359 P.3d 739 (2015) ("[A] threat need not be communicated to the threat's target but instead can be communicated indirectly to a third party.") However, the defendant must communicate the threat to

---

[3] "(1) A person is guilty of intimidating a witness if a person, by use of a threat against a current or prospective witness, attempts to: (a) [i]nfluence the testimony of that person; (b) [i]nduce that person to elude legal process summoning him or her to testify; (c) [i]nduce that person to absent [themselves] from such proceedings; or (d) [i]nduce that person not to report the information relevant to a criminal investigation. . . ." RCW 9A.72.110(1)(a)-(d).

11

someone. *See Ozuna*, 184 Wn.2d at 247.

When asked by the State if he had concerns about "retaliation for what [he] observed," Darren Estes testified that he was concerned at the time the shooting took place, and still had concerns, because he "witnessed a murder and . . . was unaware of the situation, who the people were and what they were capable of." 2 RP (Oct. 24, 2023) at 684. When asked if she had concerns about her safety after the shooting ended, S.E. testified that she was concerned "[b]ecause [she] didn't know if the car was going to turn back around." 2 RP (Oct. 24, 2023) at 734. While this and other testimony from Estes and S.E. conveyed that they were each concerned about retaliation and safety, it more properly supports the charge that Potter assaulted Estes and S.E. by firing shots at them, not that he was attempting to intimidate them.[4] The evidence at trial was insufficient to prove that Potter shot at Estes and S.E. to intimidate them from testifying or to influence their testimony.

We remand for the trial court to vacate with prejudice the two convictions for intimidating a witness. Resentencing is not required for two reasons. First, Potter's offender score will not change on remand. The score was not increased by either conviction at the original sentencing because the trial court concluded that both of the

---

[4] The jury was instructed on the elements of the crime of first degree assault as to both Estes and S.E. *See* CP at 537, 538.

intimidating of witness offenses were the same criminal conduct as their corresponding

assault offenses. *See* RCW 9.94A.589(1)(A) (Current offenses are counted as one crime

if the trial court enters a finding that both offenses were the same criminal conduct.).

Second, the trial court imposed the minimum standard range sentences for the assault

convictions. Had the trial court imposed anything other than the minimum sentences

for those convictions, Potter would have been entitled to argue for a lower standard range

sentence due to the vacation of the two intimidating a witness convictions. Resentencing

is not required when an offender score change does not affect the standard range unless

the trial court indicated its intent to sentence at the low end of the sentencing range. *See*

*State v. Kilgore*, 141 Wn. App. 817, 824-25, 172 P.3d 373 (2007) (*Kilgore* I), *aff'd*, 167

Wn.2d 28, 216 P.3d 393 (2009) (*Kilgore* II) (plurality opinion); *see also State v. Fleming*,

140 Wn. App. 132, 138, 170 P.3d 50 (2007); *State v. Argo*, 81 Wn. App. 552, 915 P.2d

1103 (1996).

*Sufficiency of the evidence: premeditated element of first degree murder*

Potter argues insufficient evidence was presented to support the premeditation

element of the first degree murder conviction. He claims that the State did not present

evidence of stealth or motive, or of how he obtained the firearm, or what happened

inside the Kia driven by Alyssa Longwell before the shooting. Further, Potter argues that

there was no evidence of any contextual fact about the relationship between Potter and

Longwell on the day of the shooting, nor was there evidence of statements made by Potter related to the incident. Potter argues that given this lack of evidence, the premeditated first degree murder conviction should be vacated and the case should be remanded for imposition of the lesser included offense of second degree murder. We disagree.

"In considering a sufficiency of the evidence challenge, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quoting *State v. Luvene*, 127 Wn.2d 690, 712, 903 P.2d 960 (1995)). "We accept the State's evidence as true and view all reasonable inferences in favor of the State," with "[c]ircumstantial evidence . . . considered to be as reliable as direct evidence." *State v. Stewart*, 141 Wn. App. 791, 795, 174 P.3d 111 (2007). "Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial." *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995) (citing *State v. Gentry,* 125 Wn.2d 570, 597, 888 P.2d 1105 (1995)).

"'Premeditation must involve more than a moment in time; it is defined as the deliberate formation of and reflection upon the intent to take a human life and involves

the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Castro DeJesus*, 7 Wn. App. 2d 849, 883, 436 P.3d 834 (2019) (quoting *State v. Hoffman,* 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)). "'Premeditation,'" for purposes of first degree murder, "''is the deliberate formation of a reflection upon the intent to take a human life.'" *State v. Sherrill*, 145 Wn. App. 473, 186 P.3d 1157 (2008) (quoting *Hoffman*, 116 Wn.2d at 82). Examples of evidence supporting a finding of premeditation include: motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, generally the manner or method of killing, assault with numerous means or a weapon not readily available, and the planned presence of a weapon at the scene. *Hoffman*, 116 Wn.2d at 83; *State v. Bingham*, 105 Wn.2d 820, 827, 719 P.2d 109 (1986); *State v. Rehak*, 67 Wn. App. 157, 164, 834 P.2d 651 (1992).

Here, the jurors were instructed:

The State alleges that the defendant committed murder in the first degree by one or more of the following means or methods: (a) with premeditated intent or (b) in the course of committing robbery in the first degree. To return a verdict of guilty, the jury need not be unanimous as to which of the alternatives has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt. You will be given a special verdict form that asks whether the jury was unanimous as to each of the alternatives or unanimous as to one of the alternatives.

CP at 518. After finding Potter guilty of first degree murder, the jurors completed a

special verdict form, finding that Potter caused the death of Alyssa Longwell with

premeditated intent but not in the course or furtherance of committing first degree

robbery. The jury also responded affirmatively to the following question: "If the jury

found the defendant guilty of Murder in the First Degree but the jury was not unanimous

on one or both of the alternatives, was the jury unanimous that the defendant . . .

committed at least one of the alternatives?" CP at 562. [5]

> The trial court instructed the jury on the definition of "premeditated":

> > Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

CP at 521. This instruction is in accord with RCW 9A.32.020.

> In this case, the manner and method of how the killing occurred could be

viewed by the trier of fact as evidence of premeditation, with a rational juror concluding

that there was sufficient evidence to find premeditation beyond a reasonable doubt.

Although the State presented no direct evidence of premeditation, there was

circumstantial evidence of premeditation. Jurors heard testimony from Darren Estes

---

[5] The jurors were similarly instructed as to the charge of second degree murder, and instructed on the elements necessary to find Potter guilty of first degree assault of Alyssa Longwell.

and S.E. that they encountered the lime green Kia multiple times on Badger Mountain Road. The last time Estes and S.E. came upon the Kia was when it was ahead of them, with the Kia rolling slowing and then abruptly stopping, which prompted Estes to say out loud, "something's going on" and directing his daughter to stop. 2 RP (Oct. 24, 2023) at 661-63. Estes and S.E. watched as Longwell pushed herself out backward from the vehicle, and then saw Potter navigate through the same driver's side door from the passenger's seat, to stand above Longwell, who was on the ground and attempting to move herself away from Potter. Based on this evidence, a rational trier of fact could reasonably conclude Longwell was trying to retreat from a confrontation with Potter that had started inside the Kia.

Standing over and straddling Alyssa Longwell, Potter pulled the trigger five times with gunshots being inflicted to the back of Longwell's head, her face, the middle of her back, her shoulder, and her leg. There would necessarily have been pauses between the shots fired and the trigger being pulled again and again. The manner of killing was witnessed and described by Darren Estes as an "[e]xecution," 2 RP (Oct. 24, 2023) at 695, with the distance between Potter and Longwell being close, with the lay witness testimony supported by testimony from a forensic witness. The act of Potter crawling from the passenger seat over and through the driver seat, exiting, and then positioning himself such that he was straddling Longwell, and then shooting Longwell multiple times

17

does constitute more than a moment of time.

Medical examiner Dr. John Lacey testified about his findings from an autopsy of Alyssa Longwell. Dr. Lacey determined that Longwell sustained five discrete gunshot wounds. According to Dr. Lacey, Longwell "had one [gunshot wound] in her face, left cheek coming out below the right side of her jaw. She had one in the back of her head. She had one that just—it's called a graze wound. It just skinned the skin over her left shoulder blade. She had on[e] in her left leg below her knee that came out right above her—her knee, as well." 3 RP (Oct. 27, 2023) at 1360-61. Dr. Lacey opined that the wounds to Longwell's face and left leg were consistent with the shots being fired from a distance of 6 and 24 inches. The angles and trajectory of the various wounds indicated Longwell was moving, and the shooter could also have been moving, at the time the shots were fired.

A rational trier of fact, viewing the eyewitness testimony and forensic evidence, could find the premeditation element of the first degree murder conviction was proved beyond a reasonable doubt. Substantial evidence supports Potter's conviction for premeditated first degree murder.

*Competency*

Potter argues that the trial court abused its discretion when it found him competent to stand trial based on what he characterizes as a "substandard" evaluation. Appellant's

Opening Br. at 44. Specifically, Potter argues that "[w]hat is most troubling is the [DSHS] evaluator's contradictory statements noting that Mr. Potter did not participate in the interview but there was sufficient data to form an opinion as to his competency." Appellant's Opening Br. at 46. We disagree.

"We review a trial court's competency determination for abuse of discretion." *State v. Ortiz-Abrego*, 187 Wn.2d 394, 402, 387 P.3d 638 (2017). "A court abuses its discretion only when an 'order is manifestly unreasonable or based on untenable grounds.'" *Id*. (quoting *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 668, 260 P.3d 874 (2011)). "A discretionary decision is 'manifestly unreasonable' or 'based on untenable grounds' if it results from applying the wrong legal standard or is unsupported by the record." *Id*.

"It is a fundamental principle of state and federal law that incompetent defendants may not stand trial. This right is protected by the due process clause of the Fourteenth Amendment." *State v. Coley*, 180 Wn.2d 543, 551, 326 P.3d 702 (2014). "Washington law implements this due process protection by statute. RCW 10.77.050 provides that '[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as incapacity continues.'" *Id*.

"Chapter 10.77 RCW governs the procedures and standards trial courts use to judge the competency of defendants to stand trial." *Id*. "[A] defendant is competent to

19

stand trial if [they have] the capacity to understand the nature of the proceedings against

[them] and . . . can assist in [their] own defense." *Id.* at 551-52 (citing former

RCW 10.77.010(15) (2010); RCW 10.77.050); *See also Dusky v. United States*, 362

U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). "Whenever there is reason

to doubt a defendant's competency to stand trial, the court must order an expert to

evaluate the defendant's mental condition. [Former] RCW 10.77.060 [(2004)]. Upon

the court's own motion or the motion of *any* party, the court may order an evaluation

and report on the defendant's mental condition. [Former RCW 10.77.060]. If the court

finds the defendant incompetent following an evaluation under [former] RCW 10.77.060,

it must stay the proceedings and may commit the defendant for treatment. [Former]

RCW 10.77.088 [(2012)]." *Coley*, 180 Wn.2d at 552.

The trial court has "wide discretion in judging the mental competency of every

defendant to stand trial or plead guilty." *State v. Dodd*, 70 Wn.2d 513, 514, 424 P.2d 302

(1967). "The trial judge may make [their] determination from many things, including the

defendant's appearance, demeanor, conduct, personal and family history, past behavior,

medical and psychiatric reports and the statements of counsel." *Id*.

Here, Potter fails to demonstrate that the trial court abused its discretion. Defense

counsel's motion for a mental evaluation was based on communication problems with

Potter. In a declaration submitted in support of the motion, counsel stated that Potter

"presents an inability to participate in conversations with me in any meaningful way, making it difficult, if not impossible for me to assist him in any meaningful way. I have reason to believe that mental health issues may be involved in this case . . . . In my professional judgment, Mr. Potter is unable to assist me in my defense of his case at this time." CP at 52. The trial court granted the defense motion and ordered a competency evaluation, which was completed by a DSHS licensed psychologist/forensic evaluator. The psychologist concluded that Potter did not display active symptoms of a mental illness and that Potter possessed the capacity to understand the nature of the proceedings against him and to assist in his own defense. Notably, defense counsel did not object to the competency finding made by the trial court, commenting that "competency is a very low bar and [the psychologist did] make some explanations in [the evaluation]." 1 RP (Feb. 14, 2023) at 71. At the same hearing, the trial court acknowledged that defense counsel had the right to request a second evaluation at any time, even after the commencement of trial. For these reasons, it cannot be said that the trial court's competency ruling was manifestly unreasonable or based on untenable grounds. The trial court properly exercised its discretion in determining competency and made its determination based on the competency evaluation report and statements made by

counsel.[6] The court also had the benefit of its own observations of Potter's appearance

and conduct throughout the proceedings. The trial court did not abuse its discretion by

finding Potter competent to stand trial.

CONCLUSION

We remand with instructions for the trial court to vacate with prejudice the two

convictions for intimidating a witness, but otherwise affirm the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.[7]

_____
Murphy, J.

WE CONCUR:

_____     _____
Lawrence-Berrey, C.J.                Fearing, J.

---

[6] Defense counsel did make a record at the competency hearing, specifically counsel's concerns about how the psychologist/evaluator reached their conclusions.

[7] Almost four months after this appeal was heard, Potter filed in this court a "Motion for Ineffective Assistance of Counsel." In the motion, Potter claims he received ineffective assistance of appellate counsel. We decline to address Potter's motion on appeal, and direct Potter to pursue these claims through a personal restraint petition. *See, e.g.*, *In re Personal Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012).